FOODLAND DISTRIBUTORS v AL-NAIMI

Docket No. 178201. Submitted May 8, 1996, at Detroit. Decided December 13, 1996, at 9:30 A.M. Leave to appeal sought.

Foodland Distributors brought an action in the Wayne Circuit Court against Metropolitan Grocery, Inc., seeking claim and delivery of its collateral under a security agreement and payment of $697,952 for unpaid grocery products. The trial court, Kathleen MacDonald, J., appointed a receiver to operate Metropolitan. Michigan National Bank (MNB), the holder of a blanket first-priority security interest in all Metropolitan's assets, intervened as a defendant. After several reports from the receiver, the court approved the liquidation of Metropolitan. MNB received $195,000 and the plaintiff received no payment. The plaintiff then filed an amended complaint adding as individual defendants, Atour Abro, the president, director, and sole shareholder of Metropolitan, Amir Al-Naimi, Atour's brother and the de factor owner and operator of Metropolitan, and Amir's wife, Sandra Al-Naimi. The allegations against the individual defendants included claims of fraud, conspiracy, unjust enrichment, conversion, and fraudulent conveyance. Part of the plaintiff's claims were based on a restructure agreement that Metropolitan, Amir, and Sandra entered into with MNB whereby, without any consideration being given, Amir and Sandra's personal debt to MNB was restructured to reduce their personal obligation to MNB by at least $3 million and the debt of Metropolitan to MNB was increased by $400,000. Metropolitan was dismissed as a party when it and the plaintiff accepted mediation. The counts against the individual defendants were tried in a bench trial and the court determined that the plaintiff had no cause of action against the individual defendants. The plaintiff appealed, alleging that the trial court erred with regard to the allegations of fraud and fraudulent conveyance.

The Court of Appeals held:

1. The trial court erred in finding that the restructure agreement did not constitute a fraudulent conveyance. The transfer of the debt without adequate consideration was a fraudulent conveyance under MCL 566.14; MSA 26.884. Because Metropolitan was probably insolvent before the restructure agreement increased its debt, it was insolvent for purposes of MCL 566.14; MSA 26.884.

2. Metropolitan may be considered to be a "person" under the Uniform Fraudulent Conveyance Act, MCL 566.11 *et seq.*; MSA 26.881 *et seq.*

3. An equitable remedy is appropriate under the facts of this case. A money judgment may be entered.

4. The overwhelming evidence establishes fraud and an ample basis to pierce the corporate veil of Metropolitan and permit the plaintiff to recover the $697,952 for unpaid grocery products against all the individual defendants.

Reversed and remanded.

O'CONNELL, P.J., dissenting in part, stated that the amount of the plaintiff's recovery against Amir and Sandra under the fraudulent conveyance claim should be limited to the amount of liability imposed upon Metropolitan for no consideration. In addition, the trial court did not err in rejecting the plaintiffs' other fraud claims including claims of common-law fraud and silent fraud. The trial court did not err in declining to pierce the corporate veil of Metropolitan.

1. FRAUDULENT CONVEYANCES — DEBTS — UNIFORM FRAUDULENT CONVEYANCE ACT — WORDS AND PHRASES — "PERSON."

The conveyance of a debt to a person who is or will be thereby rendered insolvent is fraudulent with regard to the person's creditors without regard to the person's actual intent if the obligation is incurred without a fair consideration; a corporation may be considered to be a person for purposes of the Uniform Fraudulent Conveyance Act; the conveyance of a debt under such circumstances does not have to result in a preferential payment to another creditor for the increased debt to be considered a fraudulent conveyance (MCL 566.14; MSA 26.884).

2. FRAUDULENT CONVEYANCES — REMEDIES — EQUITY — MONEY JUDGMENTS.

A money judgment may be issued against a fraudulent transferee where the res that was fraudulently transferred has been placed out of the reach of the court or where the actions of the transferee have caused it to lose value; a money judgment also may be appropriate where it would be futile to rescind or set aside a fraudulent transaction because rescission or a similar action would not provide a remedy to the creditor who was injured by the fraudulent conveyance.

3. CORPORATIONS — PIERCING THE CORPORATE VEIL — ELEMENTS.

Three elements should be satisfied in order to pierce the corporate veil and disregard the corporate entity: first, the corporate entity must be a mere instrumentality of another entity or individual, sec-

ond, the corporate entity must be used to commit a fraud or wrong, and third, there must have been an unjust loss or injury to the plaintiff; the entire spectrum of relevant fact forms the background for the inquiry.

4. CORPORATIONS — PIERCING THE CORPORATE VEIL — FRAUD OR WRONG.

The "fraud or wrong" element that must be established to pierce a corporate veil must be established by clear and convincing evidence; fraud may be established by circumstantial evidence and by facts that are inconsistent with an honest purpose.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Patrick B. McCauley, Daniel D. Swanson,* and *Patrick Burkett*), for the plaintiff.

*Austin Hirschhorn,* for Amir Al-Naimi, Sandra Al-Naimi, and Atour Abro.

Before: O'CONNELL, P.J., and GRIBBS and T. P. PICKARD,* JJ.

GRIBBS, J. We concur in that part of Judge O'CONNELL's opinion finding a fraudulent conveyance as discussed in part A of § VIII of his opinion. However, the overwhelming evidence establishes fraud and an ample basis to pierce the corporate veil and permit plaintiff to recover the $697,952 for unpaid grocery products.[1]

Plaintiff argues that the trial court erred in not piercing the corporate veil of Metropolitan Grocery, Inc (New Metro), thereby permitting plaintiff to reach the assets of Amir Al-Naimi, Sandra Al-Naimi, and Atour Abro. We agree. In light of plaintiff's evidence and the entire spectrum of relevant facts, the trial court should have pierced the corporate veil and per-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] For a detailed summary of the facts of this case, see sections I-VII of Judge O'CONNELL's opinion.

mitted plaintiff to recover against all individual defendants.

An appellate court's review of a decision not to pierce the corporate veil is de novo because of the equitable nature of the remedy. *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 43; 436 NW2d 70 (1989).

As a general proposition, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock. *Kline v Kline*, 104 Mich App 700, 702; 305 NW2d 297 (1981). This fiction is a convenience, introduced to serve the ends of justice. *Allstate Ins Co v Citizens Ins Co of America*, 118 Mich App 594, 600; 325 NW2d 505 (1982). However, when this fiction is invoked to subvert justice, it may be ignored by the courts. *Id.*, citing *Paul v Univ Motor Sales Co*, 283 Mich 587, 602; 278 NW 714 (1938). See also *Wells v Firestone Tire & Rubber Co*, 421 Mich 641, 650, 651; 364 NW2d 670 (1984). The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations. *Allstate, supra* at 600.

There is no single rule delineating when the corporate entity may be disregarded. *Papo v Aglo Restaurants of San Jose, Inc*, 149 Mich App 285; 386 NW2d 177 (1986). As the Court held in *Klager v Robert Meyer Co*, 415 Mich 402, 411-412; 329 NW2d 721 (1982), "[t]he entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic

justification to determine if the corporate form has been abused." More recently, this Court has upheld the following standard for piercing the corporate veil:

> "First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff." [SCD Chemical Distributors, Inc v Medley, 203 Mich App 374, 381; 512 NW2d 86 (1994) (citation omitted).]

I

In the instant case, there was an abundance of evidence to show that New Metro was a "mere instrumentality" of Amir. There was evidence that Atour, New Metro's president, took little, if any, active role in the business, and the trial court so found. The evidence was overwhelming that everyone knew that Amir was the de facto owner and operator of New Metro. Amir admitted that, over several years, his wholesale operations and his brothers' stores loaned money back and forth to each other. Most importantly, New Metro assumed $400,000 in debt with no consideration as part of a package restructuring Amir and Sandra's personal debt, and the trial court so found. Thus, upon review de novo, we conclude that New Metro was a "mere instrumentality" of Amir.

II

The second element required to pierce the corporate veil is that the corporate entity must be used to commit a fraud or wrong. This is, of course, the central issue of this appeal. It is true that fraud must be established by clear and convincing evidence and must never be presumed. See, e.g., Hi-Way Motor Co

*v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). However, fraud may be established by *circumstantial evidence. Goldberg v Goldberg*, 295 Mich 380, 384; 295 NW 194 (1940). In other words, fraudulent or wrongful conduct may be inferred from other evidence. In light of this standard, the following evidence is relevant to the issue whether New Metro was used to commit a fraud or wrong upon plaintiff: .

(1) An extraordinary $400,000 inventory shortage in a three-month period. This is almost the entire portion of the total inventory received by New Metro during this time. Jerry Payne (plaintiff's vice president of finance) testified that this was almost a one hundred percent inventory shortage and "typical" inventory shortages, in his experience, are in the neighborhood of one-tenth of one percent;

(2) Amir's unpersuasive explanation that the inventory loss was due to "theft," or labor problems.

(3) The dollar volume of New Metro's orders increased dramatically (two to four times the prior weeks) in January 1991, and New Metro ceased paying for purchases. At the same time, Amir was facing foreclosure on his home if a restructuring of his and Sandra's personal debt could not be reached; in less than a four-week period, New Metro ran up a debt to plaintiff of about $690,000.

(4) Amir's brothers owned and operated retail grocery stores that sometimes stored their grocery product at the Holden Street warehouse (increasing the likelihood that the $400,000 inventory was sold on the shelves of Amir's brothers' stores, even though no financial records of New Metro reflect this).

(5) In 1991, Amir's expenses exceeded his reported income by over $200,000, based upon Van Conway's

calculations (Conway was plaintiff's expert witness, a certified public accountant with forensic accounting experience).

(6) Even assuming that Amir's testimony about borrowing funds from friends and family in 1991 is true, Amir's personal lifestyle seemed unaffected by the major downturns in his business suggests that he was either incredibly optimistic or that he had another, unreported source of income (such as a $400,000 inventory would provide), and

(7) Amir negotiated a restructuring of his personal debt, in an agreement that saddles New Metro with $400,000 additional debt, *at a time when New Metro's own financial future was very uncertain* (i.e., Amir had to know that putting a $675,000 debt load on New Metro was going to put it out of business).

It is generally held that fraud must be proved by "clear and convincing" evidence, rather than by the preponderance of the evidence. The voluminous transcript in this case reveals more than sufficient evidence to show fraud by a clear and convincing evidence standard. Fraud may be proved with " 'facts which are inconsistent with an honest purpose.' " *Daugherty v Park*, 289 Mich 561, 565; 286 NW 829 (1939) (citation omitted). In our view, certain of the individual transactions at issue (i.e., the inventory shortage, the increased purchases, the loans between Amir's businesses and his brothers' stores, and the discrepancy between Amir's income and his expenses) when viewed with the portion of the restructure agreement that saddled New Metro with $400,000 in increased debt for no consideration, leads to but one conclusion: fraud. See *Herman v Mobile Homes Corp*, 317 Mich 233, 246; 26 NW2d 757 (1947):

"But after all it comes down to a question of good faith and honesty in the use of the corporate privilege for legitimate ends. If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield." [Citation omitted.]

See also *Papo v Aglo Restaurants*, supra at 302, n 15, and the additional cases cited therein for the proposition that the corporate veil can be pierced even in the absence of fraud.

## III

Finally, the third element necessary to pierce a corporate veil is that there must have been an unjust loss or injury to the plaintiff. The testimony reveals that New Metro placed orders in the $50,000 range for many months and that New Metro always timely paid its account from the inception of the business relationship until problems arose eight months later, in January 1991. Thus, the January incident was the *first* time any such problems had arisen. Additionally, as plaintiff notes, one accused of fraud may not raise as a defense the carelessness of the party defrauded. *Rood v Midwest Matrix Mart, Inc*, 350 Mich 559, 570; 87 NW2d 186 (1957). Plaintiff's complaint seeks payment of $697,952 for unpaid grocery products.

The trial court clearly erred in its findings and conclusions. In light of plaintiff's evidence and "[t]he entire spectrum of relevant fact," *Klager*, supra at 411, the overwhelming evidence established fraud and an ample basis to pierce the corporate veil and permit plaintiff to recover against individual defendants Amir Al-Naimi, Sandra Al-Naimi, and Atour Abro.

Reversed and remanded. The trial court shall enter a judgment for plaintiff consistent with this opinion.

T. PICKARD, J., concurred.

O'CONNELL, P.J. (*concurring in part and dissenting in part*). Plaintiff Foodland Distributors, a grocery wholesaler, alleged in the lower court that defendants (other than Michigan National Bank) purchased nearly $700,000 in groceries from plaintiff and failed to pay for the purchase. Following a seven-day bench trial, the circuit court issued a written opinion finding no cause of action. Plaintiff appeals as of right, arguing that portions of the trial court's ruling were erroneous and should be reversed. For the reasons stated herein, I would reverse the lower court decision in part and remand with directions.

### I. THE PARTIES

Plaintiff Foodland Distributors is a grocery wholesaler. It serves primarily full-service supermarkets, although it also caters to a few "independents." Defendant Metropolitan Grocery, Inc. (New Metro), was a "cash and carry" wholesaler of grocery items to small convenience stores; it was incorporated in December 1989. On paper, the president, director, and sole shareholder of New Metro was defendant Ms. Atour Abro, also known as Atour Naimi. However, the de facto owner and operator of New Metro was Atour's brother, defendant Amir Al-Naimi. Amir's wife, Sandra Al-Naimi, was also a named defendant. Michigan National Bank (MNB) held a blanket first-priority security interest in all New Metro's assets. MNB also held a personal guaranty executed by Amir and San-

dra that arose out of loans to a previous business, Metro Grocery, Inc. (Old Metro).

## II. PROCEDURAL BACKGROUND

Plaintiff sued New Metro on March 12, 1991, seeking claim and delivery of its collateral under a security agreement and payment of $697,952 for unpaid grocery products. On March 21, 1991, the trial court appointed a receiver to operate New Metro. MNB intervened as a defendant. After several reports from the receiver, on April 12, 1992, the trial court approved the liquidation of New Metro. As a result of the liquidation, MNB received $195,000 as first-secured creditor. However, plaintiff—which before filing suit had recovered only $2,800 in inventory from New Metro (toward the $697,952 debt)—received no payment at all from the liquidation.

In June 1991, plaintiff filed a First Amended Complaint adding the individual defendants and alleging fraud, conspiracy, unjust enrichment, conversion, and fraudulent conveyance. In essence, plaintiff alleged that Amir and his family ordered the groceries on behalf of New Metro with no intent of paying for them, disposed of them surreptitiously, and kept the proceeds.

New Metro itself was dismissed as a party on July 21, 1992, when both plaintiff and New Metro accepted mediation. *New Metro is thus not a party on appeal.* Similarly, MNB is not a party to this appeal, apparently because it was satisfied with the relief it obtained below (i.e., the $195,000).

The counts against the individual defendants were tried in a bench trial during June and July 1993. Over a year later, the circuit court issued a written opinion

finding that plaintiff had no cause of action against defendants. On appeal, plaintiff pursues only its fraud and fraudulent conveyance claims, arguing that the trial court's ruling was erroneous with regard to these counts and should be reversed.

### III. BACKGROUND: OLD METRO

Amir Al-Naimi began in the food business about 1968 or 1969. Most of his relatives are in the food business. The Joy Thrifty Scott grocery store has been owned and operated by Amir and his brothers for about twenty years; Amir's brothers Emad and Adnan oversee the daily operations of that store. Another store, the Thrifty Scott store, is overseen by Amir's brother Allah, and the Livernois Express store is owned by Amir's brother Esam.

Amir entered the wholesale food business in 1981, when he incorporated Metro Grocery Inc. (Old Metro) and named himself president of that corporation. In December 1984, Amir bought a warehouse on land contract for the conduct of Old Metro's business on Holden Street, in Detroit. Old Metro supplied grocery products to Amir's brothers' two retail stores (among other stores) and, at various times, the two retail stores used the Holden Street warehouse to store their groceries. Amir testified that in the late 1980's and into 1990, his wholesale operations and the brothers' stores loaned money to each other, back and forth.

By 1989, Old Metro had an outstanding debt to MNB in the amount of $7 million; the brothers' two stores also had loans from MNB. The loans were personally guaranteed by Amir and Sandra and contained cross-default and cross-collateralization clauses. MNB also

held a mortgage on Amir and Sandra's West Bloom-field residence, as well as on other properties owned by them. In November 1989, when MNB discovered a $2 million inventory shortage at Old Metro, it stopped funding Old Metro's line of credit, and Old Metro went into bankruptcy. In December 1989, Old Metro's assets were transferred to MNB for liquidation as part of the bankruptcy.

In 1990, MNB "carved out" the loans to the two brothers' stores from the rest of Old Metro's indebtedness. The purpose of the "carve out" was to restate the two brothers' stores' obligations to MNB, as well as to require that the brothers' stores' indebtedness to Old Metro (i.e., for groceries purchased) be paid directly to MNB, so that MNB could obtain Old Metro's outstanding receivables. As part of the "carve out," the brothers' two stores were conditionally released from their responsibility (pursuant to the cross-collateralization clauses) for the Old Metro debt (assuming they stayed current on their new respective loans). Amir and Sandra, who had signed a personal guaranty for Old Metro's debt, remained liable.[1] By June or July 1990, Old Metro's debt to MNB was about $5,000,000.

MNB and Amir negotiated for several months over the resolution of this Old Metro debt; Amir threatened to countersue if MNB foreclosed on his home. Amir's 15,000 square foot home sits on 3½ acres, has an indoor swimming pool, whirlpool, sauna, seven bedrooms, eight bathrooms, and two kitchens. Between

---

[1] The Holden Street warehouse facility Amir owned was an old Packard assembly plant that had asbestos around the pipes, as well as an underground storage tank with potential for battery acid and oil seepage. MNB did not want this asset.

1990 and 1991, Amir also owned a Mercedes, a 1986 Jaguar, a 1989 BMW, a 1964 Corvette, a 1989 Aerostar van, as well as a fifty-eight-foot yacht that he purchased in 1986 for $400,000. MNB set November 16, 1990, as a foreclosure sale on Amir's home.

### IV. NEW METRO

Stepping back in time, New Metro was incorporated around December 9, 1989—while Old Metro was in bankruptcy. Because Amir was not "financeable" at the time, the new corporation was structured with Amir's sister, Atour, as president and sole officer and director, although everyone was aware that Amir continued to be the de facto owner and operator of the business.[2] New Metro was a "cash and carry" grocery wholesaler; it operated at the same Holden Street address as Old Metro, and most of Old Metro's customers and key employees remained with New Metro.

Amir negotiated with MNB to purchase Old Metro's inventory for New Metro, and MNB financed this purchase for $233,000. Atour, on behalf of New Metro, signed a promissory note with a due date of May 5, 1990.[3] MNB took a blanket security interest in all New Metro's assets to secure the note. MNB also obtained Amir's personal guaranty for the $233,000.

New Metro initially bought its grocery products from Scott Lad. However, early in the first quarter of 1990, New Metro contacted Foodland (plaintiff) to inquire about purchasing products from plaintiff. Plaintiff's president, and others, met with Amir and

---

[2] Atour received an annual income of about twelve to fifteen thousand dollars, in this position.

[3] The note was not paid off on May 5, 1990.

New Metro's sales manager, Chuck Verbeerst, to discuss this possibility. Old Metro's bankruptcy and other issues were also discussed at this meeting.

Plaintiff's vice president of finance, Jerry Payne, testified that plaintiff's employees visited New Metro's facility, did an appraisal of the equipment, evaluated MNB's security position, did a Uniform Commercial Code search on both Old Metro and New Metro, reviewed financial statements on New Metro, and inquired in the industry about Amir. Payne was aware of MNB's first-secured position for $233,000, but, after review of New Metro's financial statements, Payne concluded that New Metro's assets exceeded liabilities by about $60,000. Plaintiff thus decided to supply New Metro, with a ceiling on purchases of approximately $50,000 (a week), taking as collateral $25,000 in (industry standard) wooden pallets in New Metro's possession.[4] Around May 2, 1990, plaintiff also entered into a security agreement with New Metro, which, among other things, required New Metro to file regular financial statements with plaintiff. Plaintiff did *not* obtain Amir's personal guaranty as part of the agreement. Plaintiff was told that, because of the bankruptcy of Old Metro, Amir was prohibited from signing a guaranty.

Plaintiff's normal terms require the purchaser to pay within seven days after the end of the week; that is, payment for shipments made last week would be due Friday of this week. In April 1990, there were a few shipments from plaintiff to New Metro. However, the principal shipments started in May 1990. During

---

[4] These pallets were later purchased by plaintiff and the credit was applied to New Metro's account before the January 1991 incidents at issue arose.

the first two to three months, New Metro's average weekly order was approximately $40,000 to $50,000. The purchases eventually increased to about $100,000 a week in 1990. Although plaintiff requested financial statements from New Metro between April 1990 and January 1991, plaintiff was told that the statements were not yet prepared, and none were provided. However, during 1990, it is undisputed that New Metro was timely in paying for its weekly orders. If a check did not arrive, plaintiff would telephone New Metro and would immediately be paid.

In January 1991, New Metro's weekly orders to plaintiff increased dramatically and New Metro ceased paying for purchases. New Metro purchased $145,423 on January 11, 1991, $182,245 on January 18, 1991, $212,200 on January 25, 1991, and $151,408 on February 1, 1991. On those same dates, the negative balances in New Metro's bank account were, respectively, $34,879.70, $67,797.15, $24,392.15, $5,263.42. Thus, in less than a four-week period, New Metro incurred a debt to Foodland alone of about $690,000. Plaintiff telephoned New Metro about the account repeatedly and was repeatedly told that a check was "coming." When no check appeared, plaintiff's comptroller finally discontinued shipments to New Metro. Amir admitted at trial that he knew in January 1991, at the time of the increased purchases, that New Metro did not have the cash flow to pay for the products that were being purchased.

Payne (plaintiff's vice president of finance) attempted to set up a meeting with Amir and then met with representatives of MNB to discuss the fact that plaintiff had not been paid and to notify MNB that, as a secured creditor, plaintiff intended to pursue col-

lection. At that meeting, Payne learned for the first time about the "restructure agreement."

### V. THE RESTRUCTURE AGREEMENT

The "restructure agreement" was an agreement between New Metro, MNB, and Amir and Sandra. The agreement essentially restructured $6,839,130.18 of Amir and Sandra's *personal* debt to MNB (incurred as a result of their guaranty of the Old Metro debt) so that they could keep their West Bloomfield home. The scheduled November 16, 1990, foreclosure never occurred.

The restructure agreement was dated January 17, 1991—*the day before New Metro's payment to plaintiff for the January 11, 1991, order was due.* Under the terms of the restructure agreement: (1) Amir and Sandra received a new loan for $575,000 (to refinance the debt on their home); (2) Amir remained personally obligated for about $1 million; (3) Amir and Sandra turned over certain other properties to MNB, for which they were credited about $237,000;[5] (4) the bank agreed to hold another $2 million as a "suspense obligation"; that is, if Amir and Sandra, repaid the $575,000 on the stated terms, the $2 million "suspense obligation" would be forgiven; (5) the bank forgave another $3,231,000 contingent upon Amir, Sandra, and New Metro meeting their obligations; and (most important to the issues presented on appeal) (6) *New Metro's* secured debt was increased from the $233,000 that it had incurred at its inception to $625,000.

---

[5] Amir's brothers subsequently repurchased the properties that he and Sandra tendered to MNB as part of the restructure agreement.

Although New Metro, by its president, Atour Abro, executed a promissory note for $625,000, dated January 17, 1991, the most critical fact to this appeal is that MNB advanced no additional monies or line of credit for this increased indebtedness. The MNB vice president who was involved in the restructure agreement admitted that the portion of the agreement that increased New Metro's debt had the effect of reducing Amir and Sandra's personal obligation to MNB. Thus, on January 16, 1991, New Metro's debt to MNB was $233,000; on January 17, 1991, after the restructure agreement was signed, New Metro's debt to MNB was $625,000.

As stated before, plaintiff never obtained payment from New Metro for the $697,952 in purchases made in 1991; instead, plaintiff filed suit against New Metro on March 12, 1991, seeking payment of the $697,952. On March 21, 1991, the trial court appointed a receiver to operate New Metro and, after several reports from the receiver, the trial court approved the liquidation of New Metro. The May 1991 liquidation of New Metro produced only $195,000.

William Byrne, an MNB vice president, testified that MNB received approximately $195,000 from the liquidation toward its original loan amount of $233,000 and that, although other unscheduled payments had also been received, all the payments had been applied to cover interest. Thus, New Metro still owed MNB $625,000 on the restructured $625,000 obligation.[6] Plaintiff received no portion of the $195,000 produced from the liquidation.[7]

---

[6] That loan was in default at the time of trial.

[7] During the liquidation of New Metro, one of Amir's brothers purchased New Metro's inventory from MNB and opened a third wholesale

As also stated above, following the liquidation, plaintiff amended its complaint, alleging that Amir, Sandra, and Atour were personally liable for fraud, conspiracy, conversion, unjust enrichment, and fraudulent conveyance. In essence, plaintiff alleged that Amir and his family ordered the January groceries, disposed of them surreptitiously, and kept the proceeds. Defendant New Metro was dismissed from the suit, following mediation, and the case proceeded to trial only against the three individual defendants.

### VI. TRIAL

In addition to establishing the facts outlined above, at trial, plaintiff submitted the deposition de bene esse testimony of Bill Long, whose company had performed physical inventories for New Metro in 1990. Long testified that his company had performed inventories for New Metro monthly, from March 31, 1990, to December 28, 1990, and then, *at New Metro's request*, did not perform another inventory until July 8, 1991. While Long was at the Holden Street facility conducting the inventories on the first floor, he saw hi-los moving grocery product around in other parts of the building. He assumed that Amir also operated another business, such as a wholesale direct to grocers delivery system, out of the same location. Long dealt with Chuck Verbeerst when he was performing the inventories.

Plaintiff also called JoAnn Vancour, who performed most of the services for the receiver. She testified that the books and records of New Metro were not available when the receivership began because they were

---

operation called "Metropolitan Wholesale Grocery, Inc." at the same location.

not current. The receiver attempted to run New Metro, but was losing about $1,000 a week. Amir's brothers' store, Joy Thrifty Scott, stored inventory in the Holden warehouse. The inventory that was identified as New Metro's "cash and carry" inventory was stored in a different part of the warehouse than the Joy Thrifty Scott inventory, and the receiver satisfied herself that the Joy Thrifty Scott inventory was not New Metro's inventory. However, individuals from Thrifty Scott came into the warehouse and removed grocery goods while she was the receiver. Vancour did not recall being able to find any paperwork to determine whether the Joy Thrifty Scott inventory in the warehouse was legitimately acquired from New Metro.

Plaintiff also called expert witness Van Conway, a certified public accountant with experience in "forensic accounting." Conway relied upon a physical inventory done at New Metro on December 28, 1990 (by Long's company), and upon the receiver's physical inventory performed March 25, 1991, and found a difference between the two of $397,504. (In other words, in a three-month period, nearly four $400,000 in inventory was unaccounted for.) Four hundred thousand dollars in inventory would be approximately twenty thousand cases of groceries, more than enough to fill a courtroom.

Conway opined that Amir had disposed of the inventory for the personal benefit of himself and his family. Conway based his opinion upon the $400,000 inventory shortage, as well as on the difference between Amir and Sandra's declared income and their expenses for 1991. Amir and Sandra's 1991 federal tax return showed a gross income of $212,147, while their

1991 expenses were $440,096, *as calculated by Conway* on the basis of his review of Amir and Sandra's financial records and bank statements. Further, Conway noted that, according to Amir's personal financial statements (which had been created contemporaneously), Amir's net worth increased during this period. Conway reached this opinion despite the fact that, after reviewing the books and records of New Metro, plaintiff's accountants had been unable to directly trace any proceeds from Foodland purchases to Amir. Conway was not asked to review the books and records of Amir's brothers' retail stores during the relevant period (i.e., to determine whether grocery product purchased from plaintiff might have been sold in the brothers' stores).

Conway also testified that Amir had three other bank accounts that showed total deposits in 1991 of $200,000 and that Conway was unable to identify the source of that income or the nature of the expenditures from the accounts, because he had not been provided with the necessary check registers. Amir testified that he used one of the accounts for his "personal use," and another one for Al-Naimi Management, into which rent checks (i.e., presumably from his brothers' stores for use of the Holden Street warehouse) were deposited.

Amir disputed Conway's calculation of his expenses in 1991, but explained the fact that his expenses exceeded his income by stating that, in 1991, he borrowed $50,000 from a long-time friend, Nabie Yono; $80,000 from his cousin, Ferris Naimi; $50,000 from his brother, Adnan; and that he "constantly" borrows money from his closest brother, Allah. The funds borrowed from friends and family were primarily for refi-

nancing his home. Although Amir testified that he gave these people notes for the borrowed funds, none of the notes were executed until the fall of 1992 (over a year after the First Amended Complaint was filed). Interestingly, no loans from third parties were shown on Amir's May 1992 personal financial statement.

Amir testified that he lost over $1,000,000 in the business over the preceding five years. He asserted that he had a "major union problem" at the shop and that this caused sabotages of approximately a thousand cases a week. However, when asked the reason for the inventory shortages, Amir responded that he was not satisfied that he had an adequate explanation.

Amir's credibility was undermined on several occasions, such as when he admitted that he had responded "no" to a question on an application for refinancing his West Bloomfield home with Ross mortgage (during the pendency of this case) about whether he was ever a party to a lawsuit; when he answered "no" to a question on the same application about whether he had ever given up deeds in lieu of foreclosure; and when he gave an implausible explanation for the fact that the same mortgage application (falsely) stated that Amir was president and fifty percent shareholder of Sessions Recycling.

Payne, plaintiff's vice president of finance, testified that New Metro's buying was done primarily by Chuck Verbeerst, but that Verbeerst was directed by Amir on inventory levels and order quantities. The orders were electronically transmitted, so Payne could not tell who had placed the orders. Amir strenuously denied that he ever directed any New Metro employee about what or how much should be

ordered. According to both Amir and the New Metro bookkeeper, Irene Spasoff, Chuck Verbeerst had primary responsibility for ordering.

Verbeerst, who now lives out of state, testified by deposition de bene esse. He stated that Amir was at New Metro about forty hours a week, overseeing its day-to-day operations, but that New Metro orders to Foodland were prepared by a "communications machine" into which several people entered customers' orders. Amir and Verbeerst met on occasion to discuss the orders. In early 1991, Verbeerst saw that inventory was arriving in greater quantities than normal, and he discussed this with Amir; Amir told him that the increase was necessary to meet anticipated shortages of groceries due to the Gulf War. Verbeerst was concerned about how New Metro was going to pay for the increase, because business was not growing fast enough to cover the huge orders being received. Verbeerst conveyed these concerns to Amir.

Verbeerst acknowledged that Old Metro had had serious theft problems, but he did not think that New Metro did. Verbeerst confirmed that Amir's brothers' stores purchased "fill in orders," such as candy and other items from New Metro, but Verbeerst testified that the brothers' stores got no special deals from New Metro. Verbeerst stated that he and Amir were "friends."

### VII. THE LOWER COURT'S DECISION

The trial court issued an opinion finding no cause of action in which it made numerous findings. It found that plaintiff failed to establish conspiracy, fraud, or conversion. Relevant to the issues on appeal, the trial court concluded:

The controlling evidence in this case must be the prior negotiations of the parties and the resulting security agreement. Plaintiffs' [sic] presented no evidence that during negotiations Defendant Amir Al-Naimi made material misrepresentations that induced them [plaintiff] to enter into their agreement. The testimony at trial clearly established that Plaintiffs [sic] knew [New Metro's] prior business was liquidated . . . .

Plaintiffs' [sic] case rests upon their [sic] allegation that the restructure agreement between [New Metro] and Michigan National Bank caused [New Metro's] financial collapse to the detriment of Foodland. However, at trial Mr. William Byrne of Michigan National Bank testified that no payments were ever made to the bank [following the restructure agreement] and that [New Metro] was in default on all of these loans. Therefore, *this court finds that the restructure agreement has no affect* [sic] *on Foodland's or [New Metro's] ability to meet their obligations.* . . . Although this court does not condone the actions of [New Metro], the Court finds that *Plaintiffs* [sic] *have failed to meet their* [sic] *burden on their* [sic] *claim of fraud.* The evidence failed to establish any substantial and material misrepresentations by Defendant Amir Al-Naimi on behalf of [New Metro] when the corporation entered into the security agreement with Foodland. . . .

The testimony at trial did establish that [New Metro] did have a shortage of inventory of approximately $400,000 when the receiver took over in 1991. However, *Plaintiffs* [sic] *failed to establish that Defendant Amir Al-Naimi liquidated the inventory for his benefit.* Defendant Al-Naimi testified that the increased purchases were made because of the Gulf War and that he anticipated shortages of products. Defendant Amir Al-Niami [sic] also testified that he intended to pay for the purchases and even had a meeting with Plaintiffs' [sic] representatives to work out a payment schedule. Defendant Amir Al-Naimi further testified that he was able to maintain his personal assets from loans given by other family members. Plaintiffs [sic] witnesses, without supporting facts, opined that because Defendant Amir Al-Naimi did not lose his personal assets that he must have liq-

uidated the inventory to maintain his lifestyle. However, Plaintiffs' [sic] expert, Mr. Conway, admitted he could not trace the inventory or any proceeds from it.

*Plaintiffs [sic] failed to present any evidence establishing Atour Abro's involvement in a scheme to defraud* Foodland. . . .

*As to Defendant, Sandra Al-Naimi,* . . . *Plaintiffs* [sic] *alleged, but failed to prove, that she must have committed fraud* because she failed to suffer any personal loss.

In conclusion, *Plaintiffs' [sic] proofs failed to demonstrate that [New Metro] acted as anything other than a small, closely-held corporation in its day-to-day operation.* There is *no basis from the testimony to disregard the corporate entity.*

\*     \*     \*

. . . Plaintiffs [sic] argued at trial that the debt restructure agreement between Defendant Amir Al-Naimi and Sandra Al-Naimi, and Michigan National Bank was a fraudulent conveyance. The *evidence did establish that the restructure agreement was without consideration* and that $400,000 of the debt was assumed by [New Metro]. However, *the testimony did not support a finding that the transfer of this debt left [New Metro] insolvent and unable to pay its debts.*

The evidence at trial showed that [New Metro] only made payments to Michigan National Bank on the original inventory and equipment. When the receiver was appointed, the receiver continued some payments to Michigan National Bank of the same inventory and equipment loans. No payments were ever made on the additional debt. *Foodland failed to show that it was in any way affected by the restructure agreement* since the transaction did not result in any preferential or fraudulent payments to Michigan National Bank at the expense of Foodland. [Emphasis added.]

VIII. DISCUSSION OF THE ISSUES

Plaintiff raises two primary issues on appeal—fraud and fraudulent conveyance I address the fraudulent conveyance claim first.

A. FRAUDULENT CONVEYANCE

In a "typical" fraudulent conveyance, the debtor conveys certain property (i.e., an item of positive value) to another party and receives in exchange therefor insufficient consideration. See, e.g., MCL 566.14 *et seq.*; MSA 26.884 *et seq.* In this case, rather than conveying property with a positive value, Amir conveyed a *debt* to New Metro, without any attendant benefit to New Metro. The question whether conveyance of a *debt* could be a fraudulent conveyance raises interesting questions of first impression in our state.

As stated above, the lower court found that the restructure agreement, under which New Metro assumed approximately $392,000 in debt, was without consideration. The court then concluded that because the transaction "did not result in any preferential or fraudulent payments to Michigan National Bank at the expense of Foodland," plaintiff was not affected by the restructure agreement. Thus, according to the lower court, no fraudulent conveyance occurred. I disagree and believe that the lower court misinterpreted the law of fraudulent conveyance.

Relevant sections of the Uniform Fraudulent Conveyance Act (UFCA) provide:

Sec. 4. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is

incurred without a fair consideration. [MCL 566.14; MSA 26.884.]

Sec. 5. Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent. [MCL 566.15; MSA 26.885.]

Sec. 6. Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. [MCL 566.16; MSA 26.886.]

Sec. 7. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. [MCL 566.17; MSA 26.887.]

### (1) WAS NEW METRO INSOLVENT?

Section 4 of the UFCA states that conveyances and obligations incurred by a person who "is or will be thereby rendered insolvent" are fraudulent if there is not fair consideration for the transaction. MCL 566.14; MSA 26.884. As stated above, the trial court found that the "testimony did not support a finding that the transfer of this debt left Defendant [New Metro] insolvent and unable to pay its debts." The court's logic appears to have been that, because New Metro was *already* insolvent, the increased debt did not *make* New Metro insolvent.

MCL 566.12(1); MSA 26.882(1) states that "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be

required to pay his probable liability on his existing debts as they become absolute and matured." As the bankruptcy court has held, "[f]or the court to hold that a fraudulent conveyance [has occurred] the court must find insolvency based upon the value of the assets and the liabilities as they existed prior to or *as a result of* the challenged transfer." *In re Otis & Edwards, PC*, 115 Bankr 900, 911 (ED Mich, 1990). "In other words, either just before or just after the transfer, the debtor must have been unable to make ultimate payment of then-existing obligations from then-existing assets." *Id.*

The issue thus presented is whether New Metro was insolvent on either January 16, 1991 (the day before the restructure agreement was signed), or on January 17, 1992 (the day the agreement was signed). The evidence was that New Metro failed to pay for its Foodland orders of January 11, 18, and 25, and February 1, 1991; Amir admitted that this was because New Metro did not have the money to do so. This evidence is confirmed by the fact that, when the receiver operated New Metro, he lost $1,000 a week. Further, when New Metro was liquidated in May 1991, its bulk sales (which were advertised) produced only approximately $195,000.[8] The trial court's apparent conclusion that the restructure agreement did not *make* New Metro insolvent is probably correct because the evidence could support a finding that New Metro was

---

[8] This Court acknowledges that receipts from bulk sales will usually be less than from sales in the ordinary course of business and, therefore, if New Metro's assets had been sold in the ordinary course, they might have generated more than $195,000. However, there is no basis in the evidence to conclude that sales in the ordinary course of business would have resulted in sufficient funds to pay both the $625,000 debt to MNB and the $697,952 debt owed to plaintiff.

already insolvent before January 17, 1991 (the date on which the debt to MNB increased from $233,000 to $625,000). However, under the above authority, if New Metro was insolvent just before or just after incurring the additional debt, this is sufficient to establish that New Metro was "insolvent" for purposes of § 4 of the UFCA.

### (2) IS NEW METRO A "PERSON" UNDER THE UFCA?

Sections 4, 5, and 6 of the UFCA refer to conveyances by a "person." Although neither the Michigan act nor the uniform act provide a statutory definition of "person," courts have found corporations to be "persons" within the meaning of this act. See, e.g., *Kelley v Thomas Solvent Co*, 725 F Supp 1446, 1452 (WD Mich, 1988) (and cases cited therein). New Metro thus may be considered to be a "person" under the UFCA.

### (3) IS ASSUMPTION OF DEBT A "CONVEYANCE?"

Central to the analysis here is whether New Metro's assumption of debt, for no consideration, can be a fraudulent conveyance, even though no "asset" was transferred from New Metro to any entity. MCL 566.11; MSA 26.881 states that a " '[c]onveyance' includes every payment of money, assignment, release . . . and also the *creation of any lien or incumbrance.*" (Emphasis added.) Thus, while saddling a corporation with a debt for no consideration is not a "traditional" conveyance, it appears that the definitions in the statute are broad enough to encompass such a "reverse" conveyance.

There is also some support for this interpretation in *SCD Chemical Distributors, Inc v Medley*, 203 Mich

App 374, 378-379; 512 NW2d 86 (1994), where this Court was attempting to determine whether inventory, customers, and goodwill were "assets" within the meaning of the UFCA. The Court looked to two non-Michigan cases:[9] one case held that the UFCA applied to any property that has value; the other held that the act does not cover property that has no value. Following this logic in the instant case, a debt has *negative* value, but value nonetheless. I thus conclude that incurring a debt for no consideration could constitute a fraudulent conveyance.

### (4) IS THIS TRANSACTION A FRAUDULENT CONVEYANCE?

Of the four UFCA sections cited, *supra* § 4 (MCL 566.14; MSA 26.884) is most applicable to these facts. That section provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Recovery under this section thus requires plaintiff to prove that (1) New Metro incurred an obligation, (2) New Metro was insolvent before or as a result of incurring this obligation, and (3) the obligation was incurred without fair consideration. As with other claims of fraud, fraudulent conveyances under § 4 must be proved by clear and convincing evidence. See *United States v Rode*, 749 F Supp 1483, 1493 (WD Mich, 1990), aff'd 943 F2d 53 (CA 6, 1991), and cases cited therein.

---

[9] *Marsh v Galbraith*, 31 Tenn App 482, 486; 216 SW2d 968 (1948); *Boone v Burden*, 259 Or 402, 404-405; 487 P2d 74 (1971).

In the instant case, it is undisputed that New Metro's debt was increased from $233,000 to $625,000 as a result of the restructure agreement (element 1) and that the obligation was incurred without any consideration at all with regard to New Metro (element 3). Plaintiff also presented persuasive evidence of the second required element—that New Metro was insolvent before, or certainly as a result of, incurring the obligation. Thus, plaintiff submitted proof regarding each element necessary for a claim under § 4 of the UFCA.

The only remaining potential problem is the trial court's finding that "Foodland failed to show that it was in any way affected by the restructure agreement since the transaction did not result in any preferential or fraudulent payments to Michigan National Bank at the expense of Foodland." I have been unable to locate any requirement in § 4 that the challenged transaction result in a preferential payment to another creditor. It appears that the requirement that the obligation be incurred "without fair consideration" serves a similar function and, as stated above, the "without fair consideration" element has been met here. Therefore, I conclude that the increased debt *was* a fraudulent conveyance under § 4 of the UFCA.

### (5) WHAT REMEDY IS PLAINTIFF ENTITLED TO?

Plaintiff seeks reversal of the trial court's judgment and a remand for entry of judgment for the plaintiff against the individual defendants. In other words, plaintiff seeks a money judgment—not a rescission of the restructure agreement, an attachment of specific property that was fraudulently conveyed, or any other

remedy that requires tracing of a specific res, such as a constructive trust.

MCL 566.19(1); MSA 26.889(1) states:

> (1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such purchaser;
>
> (a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>
> (b) Disregard the conveyance and attach or levy execution upon the property conveyed.

This provision thus sets forth two options: (1) an equitable remedy of having the conveyance set aside or annulled, or (2) a legal remedy of attaching the property conveyed. *Brownell Realty, Inc v Kelly*, 103 Mich App 690, 698; 303 NW2d 871 (1981). The property "conveyed" in the instant case is the debt that was transferred to New Metro. Because neither setting aside or annulling the restructure agreement nor attaching the debt imposed upon New Metro would create a res upon which plaintiff could levy, the statutory remedies do not help plaintiff.

However, MCL 566.21; MSA 26.891 provides:

> In any case not provided for in this act, the rules of law and equity including the law merchant, and in particular the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy or other invalidating cause shall govern.

In the instant case, the parties to the restructure agreement were New Metro (by Atour Abro), MNB, and Amir and Sandra. The particular portion of the

agreement that is challenged is the $392,000 debt
added to New Metro for which New Metro received
no consideration. However, the increased debt to
New Metro did serve as partial consideration for
MNB's reduction of Amir and Sandra's personal debt.
That is, Amir and Sandra received a personal benefit
at the expense of New Metro, without Amir and San-
dra rendering consideration to New Metro (or anyone
else) and without New Metro receiving consideration
(from Amir and Sandra or from anyone else).
Whether plaintiff might have a remedy outside the
general remedy provision of the UFCA, MCL 566.19(1);
MSA 26.889(1), is thus a critical question.

The only Michigan decision located that is even
remotely relevant is *Regan v Carrigan*, 194 Mich App
35; 486 NW2d 57 (1992). There, the plaintiff was a
judgment creditor of the corporate defendant and, in
the plaintiff's case against the corporation, between
the time a mediation agreement was reached and the
entry of judgment, the corporate defendant trans-
ferred its assets to the individual defendants, husband
and wife. The plaintiff then sued the individuals and
the trial court found that the transfer of assets consti-
tuted a fraudulent conveyance under the UFCA. On
appeal, the defendants argued that the defendant wife
could not be held liable unless she personally had
conveyed the assets to herself. The Court disagreed,
stating:

> A grantee need not personally participate in a fraudulent
> conveyance in order to be liable to a defrauded creditor. It
> appears from the record that the conveyances to Mrs. Carri-
> gan were without consideration. A *grantee who receives
> property or money without giving fair consideration to
> the fraudulent grantor is subject to* having the conveyance

set aside and also subject to any *other remedies* normally available to the creditor. [*Id.* at 38-39 (emphasis added and citation omitted).]

This case provides a glimmer of Michigan support for the existence of "other remedies," at least where the party against whom the remedies are sought received something without having paid fair consideration for it.

The issue of other remedies (in particular, a money judgment) has been addressed in other jurisdictions and these decisions provide significant guidance for the instant case. In *Miller v Kaiser*, 164 Colo 206; 433 P2d 772 (1967), the plaintiff, a judgment creditor of the defendant husband only, sued the defendants, husband and wife, for fraudulent conveyance arising out of the transfer of the family home from joint ownership to the sole ownership of the wife, without adequate consideration. The Colorado Supreme Court there reasoned:

> The primary remedy in an action for fraudulent conveyance is a declaration that the fraudulent conveyance is void as to the judgment creditor. In other words, the remedy sought is to return the property fraudulently conveyed to its prior status of ownership thereby bringing it within reach of the judgment creditor of the fraudulent transferor. . . . The exigencies of any particular case may vary the form of the relief but it always must be limited to the substance of the remedy itself which is to place the judgment creditor in the same or similar position he held with respect to the fraudulent transferor prior to the fraudulent conveyance.

> \* \* \*

> . . . Implicit in this remedy is a bar to any money judgments against the *fraudulent transferor.* . . .

It becomes axiomatic therefore after analyzing this equitable remedy that a judgment creditor cannot in a fraudulent conveyance action be the recipient, as against the fraudulent transferor, of a money judgment, for the very basis of this action is the judgment debt he is endeavoring to collect. . . .

\*     \*     \*

We turn next to the question of the propriety of the money judgments imposed by the trial court against the *fraudulent transferee* . . . . It is the general rule that as long as the subject property remains in the possession of the fraudulent transferee in toto and is not depreciated by any action of the fraudulent transferee, a personal judgment against such transferee will not be sustained.

However, under special circumstances *it has nevertheless been held to be in equity's power to hold a fraudulent transferee personally liable.* Such special circumstances generally involve some activity of the fraudulent transferee in causing the property involved to be depreciated in value while in his hands or causing the property, either wholly or in part, to be placed beyond the reach of the court. Equity in such events will not allow itself to be outwitted or frustrated. It has the power to and will go to the extent necessary to achieve equitable results. *If a money judgment against the fraudulent transferee will accomplish the desired results, it will be imposed in favor of the judgment creditor.* Such a judgment, however, by its very nature will be limited in amount to the loss in value of the subject property or if the property involved has been completely disposed of and beyond the reach of the court, the judgment will be limited to the full value of the property which would have otherwise been subject to the creditor's claim. [*Id.* at 211-214 (emphasis added and citations omitted).]

*Kaiser* thus recognizes that, on the basis of equity, a money judgment may be issued against a fraudulent transferee where the res that was fraudulently transferred has been placed out of the reach of the court

or where the actions of the transferee have caused it to lose value.

Other courts have looked to their equitable powers and similarly held that a money judgment may be appropriate when it would be futile to rescind or set aside a fraudulent transaction because rescission (or a similar action) would not provide a remedy to the creditor who was injured by a fraudulent conveyance. For example, in *Leifer v Murphy*, 149 Misc 455; 267 NYS 701(S Ct, 1933), a week after the plaintiff was injured as a passenger in defendant Robert Murphy's car, Murphy incorporated his business and executed a third mortgage on his home in favor of his friend and employee, defendant Holmes. The majority of the third mortgage money (i.e., representing the amount of equity that Murphy held in his house) was paid to the newly incorporated company for stock, which was issued solely to Murphy's wife, and for which she paid nothing. Title to Murphy's home was then transferred to Holmes, and Murphy became execution-proof. The court found that the transactions were fraudulent conveyances, but, by the time of trial, the preexisting first and second mortgage holders had foreclosed, wiping out defendant Holmes' third mortgage. The court then reasoned:

> Convinced that the challenge to the transaction should be sustained, the remaining question concerns the form and extent of the relief. Under section 280 of the Debtor and Creditor Law: "In any case not provided for in this article the rules of law and equity including . . . the effect of fraud, misrepresentation . . . or other invalidating cause shall govern."
>
> *The power of equity is far-flung; no device to defraud is so circuitous that it can avoid pursuit by its searching principles. Equity will not allow itself to be outwitted or*

*cheated, or to be frustrated or lost in mazes; it will go the
lengths requisite to achieve results. It will penetrate the
form and expose the substance. It discards the pretenses
and deals with the realities. No masquerade is too subtle
for detection by equity.*

\*          \*          \*

Since Murphy's equity in the real property has been extin-
guished by the foreclosure of the first and second mort-
gages, setting aside the third mortgage and subsequent con-
veyances would avail plaintiff nothing; her victory would be
sterile. To announce that in this situation the plaintiff has
no redress would confess the impotency of equity. . . .
*Among equity's manifold weapons is "the power to adapt
its relief to the exigencies of the case." It "may award a
personal judgment against a party in lieu of setting aside
a transfer where the facts established such a personal
liability."*

Justice demands that the defendant Emma Murphy be
disgorged of an amount of her gratuity sufficient to satisfy
the plaintiff's judgment. [*Id.* at 459-460 (emphasis added
and citations omitted).]

The *Murphy* court thus found that the traditional
remedies did not adequately compensate the plaintiff
and the court therefore invoked its equitable powers
to enter a judgment against defendant Murphy's wife.

Similarly, in the instant case, setting aside the
restructure agreement does not redress plaintiff
because no res or asset of value becomes available to
satisfy the debt. However, I would find the reasoning
of *Kaiser* and *Leifer* persuasive, and I therefore
would find that an equitable remedy is appropriate on
the facts of this case. Amir and Sandra clearly
received a substantial personal benefit from the
restructure agreement, and equity should require that
they "be disgorged" of the amount of their "gratuity."

Although the restructure agreement relieved Amir and Sandra of personal debt in excess of $3 million, the amount of the judgment against them based upon a fraudulent conveyance theory (arising out of the restructure agreement) should be limited to $392,000—the amount of liability imposed upon New Metro for no consideration. ($625,000 less $233,000 = $392,000).

### B. FRAUD

Plaintiff also argues that the trial court erred in rejecting plaintiff's common-law fraud claims. A claim of fraud will not be presumed, but must be proved by "clear, satisfactory and convincing evidence." *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). A trial court's findings of fact may not be set aside unless they are clearly erroneous. *Colovos v Dep't of Transportation*, 205 Mich App 524, 527; 517 NW2d 803 (1994), aff'd 450 Mich 861 (1995). If this Court's review were de novo, I may have reached a different conclusion than the trial court; however, I cannot say that the court's findings constitute clear error. Therefore, I would affirm the court's rejection of plaintiff's fraud claims.

### (1) AFFIRMATIVE MISREPRESENTATION

Plaintiff first alleges that the trial court erred in rejecting the claim that defendants committed common-law fraud by purchasing the groceries in January 1991 and not paying for them. In *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 114; 313 NW2d 77 (1981), the Court set forth the elements required to prove common-law fraud:

"(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." [*Id.*, quoting *Candler v Heigho*, 208 Mich 115, 121; 175 NW 141 (1919), overruled on other grounds by *Black, supra.*]

Plaintiff tacitly acknowledges the general rule that a promise to do something in the future cannot support an action for fraud (*Hi-Way Motor Co, supra* at 336), but argues that the "bad faith" exception applies to this case. "Under the bad faith exception, a promise of future performance may constitute a misrepresentation where statements or conduct 'at the very time of making the representations, or almost immediately thereafter' indicate that the party making the promise had no intention of fulfilling it." Pappas & Steiger, Michigan Business Torts (ICLE, 1991), § 6.7, p 84 (quoting *Danto v Charles C Robbins, Inc*, 250 Mich 419, 425; 230 NW 188 [1930]; *Hi-Way Motor Co, supra* at 338-339). However, plaintiff must be able to produce evidence of *contemporaneous* conduct by the defendant in order for the exception to apply. Michigan Business Torts, *supra*, § 6.7, p 84.

Plaintiff does not identify any particular "representation" upon which its bad faith claim is grounded, but rather it relies upon another method of grounding a fraud claim, based upon *John Heidsik Co v Rechter*, 291 Mich 708, 711; 289 NW 304 (1939):

"But if the purchaser knows he is insolvent, and makes the purchase with the preconceived purpose not to pay, the purchase is void, even though there may not have been at

the time of the purchase any fraudulent representations."
[Citations omitted.]

I have carefully reviewed the record and find that plaintiff presented no evidence of a "preconceived purpose not to pay." Rather, Amir's testimony was that although New Metro may not have had the money to pay for the purchases at the time they were made, he intended for payment to be made when the groceries were sold to New Metro's own customers.

### (2) SILENT FRAUD

Plaintiff also asserts, apparently alternatively, that Amir's failure to disclose the restructure agreement to plaintiff constituted "silent fraud." As *Black, supra,* stated:

> It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions," since "a suppression of the truth may amount to a suggestion of falsehood." In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.

> \*       \*       \*

> . . . It is the general rule "that a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were true or believed to be true." [*Id.* at 125-127 (citations omitted).]

Plaintiff argues that, if it had known that the restructure agreement had increased New Metro's debt by $400,000, plaintiff would never have made any grocery shipments to New Metro in January 1991.

The trial court made a specific factual finding that the restructure agreement had no effect on plaintiff because the agreement did not cause MNB to get any more, or plaintiff to get any less, than the parties would have received without it. However, plaintiff disputes this finding, arguing, in essence, that it would not have been injured at all (or at least it could have minimized its loss by cutting off shipments sooner), if Amir had disclosed the existence of the restructure agreement.

I do not believe that this argument needs to be addressed here because the entity that had a duty to disclose the agreement was New Metro, which was not a party at trial and is not a party to this appeal. The business transactions (grocery orders) were between plaintiff and New Metro, *not* between plaintiff and Amir. Thus, even if New Metro did have an obligation to disclose the agreement, and even if New Metro breached that obligation, plaintiff's right to recover against New Metro for these actions is barred by the judgment entered against New Metro as the result of mediation.[10]

### (3) PIERCING THE CORPORATE VEIL

Not surprisingly, plaintiff also argues that the trial court erred in not piercing New Metro's corporate veil, thereby permitting plaintiff to reach the assets of

---

[10] In order for a prior judgment to operate as a bar to a subsequent proceeding, three requirements must be satisfied: (1) the subject matter of the second action must be the same; (2) the parties or their privies must be the same; and (3) the prior judgment must have been on the merits. *In re Pardee*, 190 Mich App 243, 248; 475 NW2d 870 (1991). These three requirements have been met in the instant case, as against New Metro. The fact that the judgment against New Metro was entered by consent following mediation does not change the result. See *Prawdzik v Heidema Bros, Inc*, 352 Mich 102, 112; 89 NW2d 523 (1958).

Amir, Sandra, and Atour. With regard to this aspect of plaintiff's claim, the trial court found that plaintiff's proofs "failed to demonstrate that [New Metro] acted as anything other than a small, closely-held corporation in its day-to-day operation. There is no basis from the testimony to disregard the corporate entity."

The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations. *Allstate Ins Co v Citizens Ins Co of America*, 118 Mich App 594, 600; 325 NW2d 505 (1982). Here, the sole shareholder of New Metro was Amir's sister, Atour. Because the evidence reflects no wrongdoing on the part of the only shareholder of New Metro, plaintiff has presented no justification for disregarding the corporate entity. Therefore, I would affirm the holding of the circuit court with respect to this claim, albeit for different reasons.

### IX. CONCLUSION

I would reverse the lower court's findings with regard to plaintiff's fraudulent conveyance claim, and, to the extent that the findings are not inconsistent therewith, affirm its conclusions regarding the fraud claim. I would also affirm the court's holding with respect to plaintiff's request that the court pierce New Metro's corporate veil. I would remand the matter for entry of judgment in the amount of $392,000 against Amir and Sandra Al-Naimi, jointly.