TRAXLER v FORD MOTOR COMPANY

Docket Nos. 200704, 200856. Submitted September 9, 1997, at Grand
Rapids. Decided January 13, 1998, at 9:05 A.M.

Steven Traxler, as next friend of Sarah A. Traxler; Deanna Traxler;
and Scott Traxler brought a products liability action in the Kent
Circuit Court against Ford Motor Company, Ford Motor Company
of Canada, and others after Sarah Traxler sustained injury as a
back-seat passenger of a 1986 Ford Tempo whose driver's seat
moved rearward when the automobile was involved in a rear-end
collision. The court, Dennis C. Kolenda, J., entered a default
against Ford Motor Company and Ford Motor Company of Canada
(hereafter collectively referred to as Ford), ruling that Ford had
lied and committed fraud when responding to the plaintiffs' discov-
ery requests relative to seat design. Ford appealed by leave
granted.

The Court of Appeals *held*:

1. The trial court had power to order a default pursuant to MCR
2.302(E)(2). MCR 2.302(E)(1)(i) provides that a party is under a
duty seasonably to amend a prior discovery response if the party
obtains information on the basis of which the party knows that the
response was incorrect when made, and MCR 2.302(E)(2) provides
that sanctions pursuant to MCR 2.313(B), including default, may be
ordered for the failure to supplement a discovery response. In this
case, any response the trial court deemed to have been a lie or
fraudulent were incorrect responses for purposes of MCR 2.302(E).

2. The trial court did not clearly err in finding that Ford had lied
or committed fraud when responding to some of the plaintiffs' dis-
covery requests.

3. A trial court, before imposing default as a sanction for failure
to respond to a discovery request, should consider whether the fail-
ure extended over a substantial period, whether an existing discov-
ery order was violated, the amount of time that elapsed between
the violation and the motion for default, the prejudice to the party
requesting default, and whether wilfulness has been shown. The
trial court should evaluate other options besides default and should
employ default only when there has been a flagrant and wanton

refusal to facilitate discovery, not when failure to comply with a discovery request was accidental or involuntary. In this case, the matter must be remanded for an evidentiary hearing to establish whether Ford's conduct constituted a flagrant and wanton refusal to facilitate discovery and whether the plaintiffs were prejudiced by Ford's noncompliance. The trial court also should consider again whether default is appropriate in light of other alternatives.

Affirmed in part, reversed in part, and remanded.

GRIBBS, J., dissenting in part, stated that although the trial court had the power to order default pursuant to MCR 2.302(E)(2) and did not clearly err in finding that Ford had lied or committed fraud when responding to the plaintiffs' discovery requests, a remand for an evidentiary hearing is not necessary because the record amply demonstrates that Ford engaged in flagrant and wanton refusal to facilitate discovery and that the plaintiffs suffered prejudice as a result. The order of default should be affirmed.

1. PRETRIAL PROCEDURE — DISCOVERY — FAILURE TO SUPPLEMENT RESPONSES TO DISCOVERY REQUESTS — DEFAULT.

A trial court may enter a default as a sanction for a defendant's failure to amend a prior discovery response that the defendant, upon obtaining subsequent information, knows to be incorrect (MCR 2.302[E][2], 2.313[B]).

2. JUDGMENTS — DEFAULT — FAILURE TO COMPLY WITH DISCOVERY REQUESTS.

A trial court, before entering a default as a sanction for a defendant's failure to respond to a discovery request, should consider whether the failure extended over a substantial period, whether an existing discovery order was violated, the amount of time that elapsed between the violation and the motion for default, and whether wilfulness has been shown; the trial court should evaluate other options besides default and should employ default only when there has been a flagrant and wanton refusal to facilitate discovery, not when failure to comply with a discovery request was accidental or involuntary.

*Rhoades, McKee, Boer, Goodrich & Titta* (by *Bruce W. Neckers, Paul A. McCarthy*, and *Molly M. McNamara*), for the plaintiffs.

*Dawson & Clark, P.C.* (by *Kathleen A. Clark* and *John R. Prew*), *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Richard A. Glaser*), *John M. Thomas*, and *Michael J. O'Reilly*, for the defendants.

Before: GRIFFIN, P.J., and WAHLS and GRIBBS, JJ.

WAHLS, J. Defendants Ford Motor Company and Ford Motor Company of Canada (hereinafter Ford) appeal by leave granted from an order of default. We affirm in part, reverse in part, and remand.

This case stems from an automobile accident in 1990. At the time of the accident, two-month-old Sarah Traxler was strapped into a child safety seat in the back of her parents' 1986 Ford Tempo. Her mother was driving, and her father was seated next to her in the back seat. As the Traxlers were waiting to make a left turn, they were rear-ended by another vehicle traveling at approximately fifty miles an hour. The force of the collision caused the driver's seat of the Traxler's car to move rearward into the back seat, striking Sarah in the head. Sarah was left with severe and permanent injuries. Apparently, no one else was injured in the crash.

Plaintiffs filed suit against the driver of the other vehicle, the maker of the child safety seat, and Ford. This appeal involves only Ford.[1] Plaintiffs' theory regarding Ford's liability revolved around the design of the driver's seat in the Ford Tempo. Their discovery requests thus focused on Ford's design process, on Ford's knowledge regarding the tendency of its seats to give way in rear-end collisions, and on other lawsuits filed against Ford alleging front-seat design defects. Discovery took place over more than two years and was marked by Ford's numerous objections and by plaintiffs' repeated motions to compel. Most of

---

[1] The driver of the other vehicle apparently settled with plaintiffs. The manufacturer of the child safety seat was dismissed below on plaintiffs' motion.

plaintiffs' motions to compel were withdrawn before the trial court could hear them, apparently because the parties agreed to work out their differences between themselves. Eventually, however, the trial court heard and granted one of plaintiffs' motions to compel. In granting the motion, the trial court warned Ford that its failure to comply with the discovery order would result in a default. In response to the trial court's order, Ford provided plaintiffs with sixty-two boxes of documents. After reviewing this new information, plaintiffs asked the trial court to order a default against Ford. They argued that the documents produced as a result of the trial court's order should have been produced far earlier and that the delay had prejudiced them to the point that default was the only appropriate remedy. The trial court agreed and entered an order of default against Ford. In its written opinion, the trial court lambasted Ford for its conduct during discovery:

> What plaintiffs' counsel discovered when they read those documents was disgusting; no other word would be accurate. For over two years, Ford had concealed very significant documents and information, and, worse, had blatantly lied about those documents and about the information in them; any word other than "lied" would understate what Ford did. . . . After carefully reviewing plaintiffs' discovery requests and some of Ford's responses (hundreds of pages), studying several rounds of briefs, and listening to counsels' very helpful oral argument, this Court had to agree that an outrageous fraud has been perpetrated by Ford . . . and that the sanction of a default . . . is the appropriate response.

Ford raises several issues on appeal. It argues that the trial court (1) did not have the power to impose a default, (2) erred in finding that Ford committed fraud, and (3) erred in denying Ford's request for an

evidentiary hearing. In addition, Ford argues that the trial court failed to consider alternative sanctions, failed to consider how Ford's errors were made and who made them, and made findings of fact that were not supported by the record. We begin by addressing the extent of a trial court's power to sanction discovery abuses.

The scope of a trial court's powers is a question of law. We review questions of law de novo. *Smith v Henry Ford Hosp*, 219 Mich App 555, 557; 557 NW2d 154 (1996). The Michigan Court Rules specifically authorize a default judgment as a sanction for certain discovery abuses. Such abuses include a failure to comply with a discovery order, MCR 2.313(B)(2)(c), failure to serve answers to interrogatories, MCR 2.313(D)(1)(b), and, under certain circumstances, failure to supplement responses to discovery requests, MCR 2.302(E)(2). Ford argues that, even assuming the trial court's factual findings were correct, none of these rules apply in this case. We disagree.

First, it is clear that the trial court did not find a violation of a discovery order, and thus, MCR 2.313(B)(2)(c) does not apply directly. Second, there is no allegation that Ford failed to serve answers to plaintiffs' various interrogatories, and thus MCR 2.313(D)(1)(b) does not appear to apply.[2] However, assuming the trial court's factual findings were cor-

---

[2] Plaintiffs argue that Ford's answers were incomplete and that they therefore constituted a failure to answer. By its express terms, MCR 2.313(D)(1)(b) applies only to a failure to *serve* answers or objections to interrogatories. Thus, it appears that MCR 2.313(D)(1)(b) applies only where a party completely fails to answer, rather than where a party's answers are somehow deficient.

rect, we believe that MCR 2.302(E) does apply.[3] That subrule states, in part:

> (1) Duty to Supplement. . . .
>
> (a) A party is under a duty seasonably to amend a prior response if the party obtains information on the basis of which the party knows that
>
> (i) the response was incorrect when made; or
>
> (ii) the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
>
> \*    \*    \*
>
> (2) Failure to Supplement.
>
> If the court finds, by way of motion or otherwise, that a party has not seasonably supplemented responses as required by this subrule the court may enter an order as is just, including an order providing the sanctions stated in MCR 2.313(B), and, in particular, MCR 2.313(B)(2)(b). [MCR 2.302(E). ]

Here, the trial court concluded that Ford "lied" and was guilty of "an outrageous fraud." Any response that can be characterized as fraudulent or as a lie was obviously incorrect when made. Thus, to the extent that the trial court found that Ford's responses constituted lies or fraud, Ford had a duty to seasonably supplement those responses. On the basis of the trial court's findings, Ford clearly failed to fulfill this duty. Therefore, the trial court had the power to order a default pursuant to MCR 2.302(E)(2).

---

[3] We recognize that the trial court did not rely on MCR 2.302(E) when it ordered a default against Ford. However, we need not reverse where the trial court reached the correct result, albeit for the wrong reason. *Cox v Dearborn Heights*, 210 Mich App 389, 391; 534 NW2d 135 (1995). Thus, we may properly consider the applicability of MCR 2.302(E).

Ford next argues that the evidence in the record does not support the trial court's conclusion that Ford lied or committed fraud. We disagree. We review a trial court's findings of fact for clear error. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 171; 530 NW2d 772 (1995). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* In this case, we are not left with a definite and firm conviction that a mistake has been made. On the contrary, the record makes it clear that Ford failed to disclose relevant, non-privileged information in its responses to plaintiffs' early discovery requests. While Ford objected to plaintiffs' discovery requests, we do not believe that those objections were sufficient to excuse Ford's conduct.

The parties and the trial court address numerous examples of Ford's conduct during discovery. Here, we simply address two interrogatories that are illustrative. We begin with an interrogatory and a response that highlight Ford's position during the early stages of discovery:

35. How many 4-door Ford Tempos were sold in 1986 by Ford dealers in the United States and Canada?

35. Ford objects to this Interrogatory on the ground that it is overly broad, vague, irrelevant, oppressive and not calculated to lead to the discovery of admissible evidence. Without waiving its objections and in the spirit of discovery, Ford states 176,976 Four-Door Tempo vehicles were sold in the United States and Canada.

This exchange is significant for two reasons. First, it illustrates the fact that Ford objected to interrogatories even where its objections were groundless on

their face; how can an interrogatory that asks for a simple numerical answer be overly broad or vague? What is the purpose of objecting on the ground that a request is oppressive when the objection is followed by the answer to the request? How could Ford argue that information regarding the number of products sold is irrelevant or not calculated to lead to the discovery of admissible evidence in a products liability suit? Clearly, Ford's objections were boilerplate, and plaintiffs were justified in ignoring them when they were followed by an answer that was responsive to their request. Ford's response also highlights the fact that, "in the spirit of discovery," Ford provided apparently complete answers to at least some of plaintiffs' requests, despite its objections. The significance of these observations becomes clear when we review one of the more important interrogatories. The parties and the trial court offer contrasting interpretations of the following interrogatory and answer:

10. State whether the same left front driver's seat and right front passenger seat tracks and seat backs, as identified previously in this set of interrogatories as having been installed on the subject vehicle, were ever installed on any other Ford Motor Company vehicle, including but not limited to Mustang, [Capri], Escort, Lynx station wagon, Thunderbird, Cougar, Taurus, Sable, Topaz, and Tempo, of any model year. If the answer is yes, state which vehicles, which model years and which seat (driver or passenger).

ANSWER:

10. Ford objects to this Interrogatory on the ground that it is overly broad, vague, irrelevant, oppressive and not calculated to lead to the discovery of admissible evidence. Without waiving its objections and in the spirit of discovery, Ford states that the seat track assemblies used in the Tempo are unique to the Tempo/Topaz car lines only.

The trial court and plaintiffs characterized Ford's response similarly. According to the trial court:

> That answer was not true. Plaintiffs have learned that the Tempo/Topaz seat was derived from the Escort/Lynx seat and that that seat had been used in numerous other models. Ford admits that now, but only after having been caught in a lie.
>
> How Ford answered plaintiffs' interrogatories about seats reveals much about its handling of discovery in this case. Ford insists that it is true that "the seat track assemblies used in the Tempo are unique to the Tempo/Topaz car lines only." That may be, but the question asked of Ford was not so limited. Ford was asked whether the front "seat tracks and seat backs" installed in 1986 Tempos "were ever installed on any other Ford Motor Company vehicle." If they were, particulars were requested. Ford objected to the interrogatory . . . and then responded that "the seat track assemblies used in the Tempo are unique to the Tempo/Topaz car lines only." What it did was craftily reformulate the question to ask only what it wanted to say, namely: that the seat track assemblies, not the seats themselves, were unique, thereby creating the misleading impression that the seats had not been used in any other vehicles. With that impression, plaintiffs would not expect to be told about tests and lawsuits involving the seats and other models, even though the seats were, it now turns out, the same. That was as dishonest as saying in so many words that the seats, not just the seat track assemblies, were unique to the vehicle. . . . Ford's answer was not simply a precise answer to a poor question; it was a dishonest answer, carefully crafted to mislead the reader. An impression can be so strong and so obviously what someone wanted to impart that it is a statement to that effect, in this case, a false statement.

As will be discussed below, we are concerned with the evidentiary basis for some of the trial court's conclusions. However, none of its findings are clearly

erroneous. Ford's arguments to the contrary are not well taken. According to Ford:

> [T]he trial court leapt to his conclusion that Ford's answer was "dishonest" and a "lie" by focusing on only one sentence of one response to one interrogatory. Ford's response to Interrogatory 10 *also* objected that the interrogatory was overly broad and that answering it would be unduly burdensome. There is no [sic] almost no burden associated with simply saying that the entire seat is unique to the Tempo/Topaz. Therefore, if that is what Ford meant to say, there would have been no objectionable burden and no point to the objection. The only interpretation of the entire response that gives effect to the objection *and* the partial answer is that *only* the seat track was unique and that the other numerous components of the seat—such as seatbacks, seat cushions, frames, recliner mechanisms, attachment bolts, springs, fabric, etc.— were so widely used that it would be unduly burdensome for Ford to try to identify all of the models and model years in which all of those components were used. [Emphasis in original; parentheticals omitted.]

Ford's position is belied by its answers to other interrogatories. As noted above, Ford made some objections that were groundless on their face. Thus, with respect to some interrogatories, there was no interpretation of the entire response that could give effect to both Ford's objection and its answer. Under these circumstances, Ford is not entitled to a presumption that its objections had any significance whatsoever. Ford's position also lacks any logical appeal. If Ford meant to say that only the seat tracks were unique, and that the other components were so common that answering the interrogatory would be unduly burdensome, it needed only say so. Instead, Ford gave what it now claims was a "partial" answer, which clearly omitted relevant information. By doing

so, Ford created the appearance that it was lying or intentionally concealing relevant information. We cannot conclude that the trial court's findings in this regard were clearly erroneous.

Next, Ford raises a number of arguments regarding the trial court's decision to order a default, rather than some less serious sanction. Default is a drastic measure and should be used with caution. *Mink v Masters*, 204 Mich App 242, 244; 514 NW2d 235 (1994). Another panel of this Court articulated the factors that a trial court should consider before ordering a default:

> Before imposing the sanction of a default judgment, a trial court should consider whether the failure to respond to discovery requests extends over a substantial period of time, whether an existing discovery order was violated, the amount of time that has elapsed between the violation and the motion for a default judgment, the prejudice to [the party requesting default], and whether wilfulness has been shown. The court should evaluate other options before concluding that a drastic sanction is warranted. [*Thorne v Bell*, 206 Mich App 625, 632-633; 522 NW2d 711 (1994) (citations omitted).]

In addition, "[t]he sanction of default judgment should be employed only when there has been a flagrant and wanton refusal to facilitate discovery and not when failure to comply with a discovery request is accidental or involuntary." *Mink, supra* at 244. We review discovery sanctions for an abuse of discretion. *Thorne, supra* at 633.

First, Ford argues that the trial court ordered a default without considering alternative sanctions. This argument finds no support in the record. The trial court clearly recognized its duty to consider

alternative sanctions; it simply concluded that any lesser sanction was insufficient to remedy the damage caused by Ford's misconduct. Next, Ford argues that the trial court's conclusions regarding the prejudice caused by Ford's conduct are not supported by the record. We disagree. As will be discussed, we are concerned about the trial court's evidentiary basis for its conclusions regarding this issue. However, we do not believe that the trial court's findings regarding prejudice are clearly erroneous.

Finally, Ford argues that, to the extent that it erred in its discovery responses, the trial court failed to consider how those errors occurred. Again, we disagree. It is clear that the trial court considered the nature of Ford's errors and concluded that they were not simple mistakes or oversights. Instead, the trial court concluded that Ford had lied and perpetrated "an outrageous fraud." We find no evidence in the record to contradict the trial court's findings, and they are not clearly erroneous. Ford's related argument, that the trial court failed to consider whether a default should be ordered against Ford for the conduct of its attorneys, is without merit. The trial court had the authority to order a default against Ford even if its attorneys were responsible for the misconduct. See *White v Sadler*, 350 Mich 511, 522; 87 NW2d 192 (1957) ("the neglect of an attorney is generally regarded as attributable to his client"). See also *American Way Service Corp v Comm'r of Ins*, 113 Mich App 423, 434-435; 317 NW2d 870 (1982).

We have discussed the prejudice caused by Ford's conduct and Ford's culpability for that conduct only briefly because we are compelled to remand this case for an evidentiary hearing regarding these issues.

Ford argues, and we agree, that it is entitled to an evidentiary hearing where it may introduce evidence (1) that its failure to comply with plaintiffs' discovery requests was accidental or involuntary and (2) that plaintiffs were not prejudiced by Ford's mistakes. We believe that due process requires such a hearing:

> Due process in civil cases generally requires notice of the nature of the proceedings, an opportunity to be heard in a meaningful time and manner, and an impartial decisionmaker. The opportunity to be heard does not mean a full trial-like proceeding, but it does require a hearing to allow a party the chance to know and respond to the evidence. [*Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1995). ]

Here, the parties should be permitted to introduce evidence regarding Ford's conduct during discovery and the extent of any prejudice to plaintiffs. After the evidentiary hearing, the trial court must determine whether Ford's misconduct constituted a flagrant and wanton refusal to facilitate discovery.[4] *Mink, supra* at 244. In addition, the trial court should again consider whether a default is an appropriate sanction in light of the available alternatives. *Thorne, supra* at 633.

Finally, in order to avoid confusion on remand, we address the parties' dispute regarding the standard of proof required to support a finding of fraud. Ford argues that the trial court improperly applied the "preponderance of the evidence" standard in finding that Ford committed fraud. Indeed, it is unclear whether a court should apply the preponderance of

---

[4] Our conclusion that the trial court's original findings were not clearly erroneous does not preclude the trial court from making different findings on remand.

the evidence standard or the "clear and convincing evidence" standard in considering an allegation of fraud.[5] However, this issue is essentially irrelevant: A trial court need not find fraud to justify an order of default. Rather, the relevant consideration is whether Ford's conduct constituted a "flagrant and wanton refusal to facilitate discovery." *Mink, supra* at 244. We see no reason to require clear and convincing evidence to support such a finding. Thus, on remand, the trial court must consider whether the factors set out in *Thorne* and *Mink* are met by a preponderance of the evidence.

For the foregoing reasons, we affirm the trial court's conclusion that it had the power to order a default where Ford lied or committed fraud. However, we reverse the trial court's order of default against Ford and remand for an evidentiary hearing in accordance with this opinion. We do not retain jurisdiction. No costs are taxable, neither party having prevailed in full.

GRIFFIN, P.J., concurred.

GRIBBS, J. (*concurring in part and dissenting in part*). I agree with the majority opinion in most respects: I agree that the trial court had the power to order default pursuant to MCR 2.302(E)(2), that its findings of fact regarding Ford's lies and dishonest answers were not clearly erroneous and that its con-

---

[5] Generally, fraud must be proved by "clear and convincing" evidence rather than by the preponderance of the evidence. *Foodland Distributors v Al-Naimi*, 220 Mich App 453, 459; 559 NW2d 379 (1996). But see *Mina v General Star Indemnity Co*, 218 Mich App 678, 684-685; 555 NW2d 1 (1996), rev'd in part on other grounds 455 Mich 865 (1997) ("we are unable to say with any degree of certainty exactly what standard of proof courts should apply in fraud cases.").

clusions that Ford perpetrated an outrageous fraud
and "engaged in a calculated campaign of conceal-
ment and deceit" were not clearly erroneous. How-
ever, I respectfully dissent from the majority's deci-
sion to remand for an evidentiary hearing. Accord-
ingly, I would affirm the trial court's order of default
against Ford and remand for a determination of plain-
tiffs' damages.

As the majority notes, the relevant consideration on
remand is "whether Ford's conduct constituted a 'fla-
grant and wanton refusal to facilitate discovery.'"
*Mink v Masters*, 204 Mich App 242, 244; 514 NW2d
235 (1994). However, in a comprehensive, single- spaced
eleven-page opinion[1] the trial court already found

---

[1] The text of the trial court's thorough, revised opinion, issued January
27, 1997, is repeated here in full:

"What is truth?" is the core question posed by every lawsuit. *Peo-
ple v Barbara*, 400 Mich 352, 357 [255 NW2d 171] (1997). Lawsuits
are not activities to generate fees, games to be won, or theater to
entertain. Lawsuits are searches for the truth of who did what and
who is to be accountable for the consequences. Given the complex-
ities of human affairs, the truth cannot always be found, but the
fair search for it is why courts, lawyers and lawsuits exist. When it
is found, the truth must be revered, and one answer to the ques-
tion, "What is truth?" must always be, "What is expected," which
means that when it is known, the truth must always be spoken. It
wasn't in this case. That is why defendant Ford Motor Company is
being defaulted.

When the truth is concealed or deliberately distorted, the reac-
tion must be outrage. Anything less accepts dishonesty and by
accepting it encourages it. That is why "[c]ourts have never been
inclined to condone or reward those who choose to perjure them-
selves. Nor should they, since the pernicious effects of perjury are
evident to all. Upon disclosure, perjury should be condemned by
the courts and the guilty party dealt with accordingly," *Lamky v
Lamky*, 29 Mich App 17, 22 [185 NW2d 203] (1970). Unless the
price for dishonesty is unbearable, the temptation to it "would be
not a little increased." *Nagi v Detroit United Ry*, 231 Mich 452, 460
[204 NW 126] (1925); and *People v Adams*, 430 Mich 679, 695 fn 11
[425 NW2d 437] (1988). Perjury "is utterly reprehensible." *In the*

*Matter of Grimes*, 414 Mich 483, 494 [326 NW2d 380] (1982); and *People v Adams*, *supra*, at 695. It tears at the very fabric of the legal system and at the objective of the rule of law, which is to keep peace in the community by fairly resolving the disputes endemic to communal life. Reverence for the truth is an essential component of fairness. If the public ever comes to believe that the courts do not abhor dishonesty, they will not accept the courts' decisions as fair and will not be willing to submit their disputes to them.

It is because Ford has been caught concealing a great deal of significant information and blatantly lying that this Court is entering a default against it. No lesser penalty is proportional to the offense. A default, not a default judgment, is being entered because Ford remains entitled to a jury assessment of plaintiffs' damage claims, *Wood v DAIIE*, 413 Mich 573 [321 NW2d 653] (1982), but a default is appropriate. It should be axiomatic that hiding information and lying cannot be tolerated and must be answered with sanctions which unmistakably say so. Regrettably, Ford needs to hear more. It insists that this Court is powerless to deal with its misconduct. That is not so. There is ample precedent recognizing the propriety of what this Court is doing in this case.[1]

### STATEMENT OF PROCEEDINGS

When she was two months old, Sarah Traxler was severely injured when the automobile in which she was a passenger was rear-ended by another automobile. Although securely fastened in a child restraint seat, Sarah suffered severe brain injuries when the back of her mother's seat collapsed onto her. In all likelihood, Sarah's physical and mental capabilities will never develop beyond those of a 3-year old. She and her parents sued the manufacturer of the child restraint seat[2] and Ford, the manufacturer of her parent's car, a 1986 Ford Tempo. Their claims against Ford are that it was negligent in not designing seats to withstand the forces imposed on them in routine collisions.

This case is now weeks from trial. It was mediated very favorably to plaintiffs, settlement efforts failed, and trial is looming. What happened during discovery is why a default is being entered. Discovery was not only extensive, it was arduous. It is apparent from the motions on file that Ford seldom answered an interrogatory, produced a document, or scheduled a deposition without burdening plaintiffs' counsel with delays and the need to fight for everything owed. A very common response to plaintiffs' interrogatories was to object to them as overbroad and, then, "in the spirit of discovery," to answer them very narrowly, effectively reformulating the questions so that the answers revealed nothing pertinent. (A

particularly pertinent example is discussed below.) Ford also played word games. For example, when plaintiffs asked for information about seats "collapsing rearward," Ford responded that it could not answer the question because the word "collapse" is ambiguous and argumentative. Ford could not locate documents, and witnesses and/or counsel were seldom available for depositions. Only dogged persistence by plaintiffs' counsel got anything. Every discovery request had to be followed with motions to compel and, then, with prolonged and wearing negotiations. In the best tradition of a civil profession, plaintiffs' counsel "worked with" Ford. Unfortunately, Ford used that willingness to evade.

Last summer, in July, Ford's discovery tactics resulted in this Court issuing an order which said and did the following:

"After a careful review of them, this Court finds (i) that plaintiffs' discovery requests at issue are appropriate, MCR 2.302(B)(1), and (ii) that, especially when placed in the context of the difficult time plaintiffs have had throughout this case obtaining information from defendants, the responses to those requests are obstructionist. Those responses appear to be a calculated effort to burden plaintiffs' counsel and to so narrowly redefine the standard of "relevant to the subject matter" in MCR 2.302(B)(1) and disingenuously invoke, given Ford's capabilities, the standard of "undue burden or expense" in MCR 2.302(C), that much of considerable potential significance to this case can be withheld by defendants. That Ford has produced much already is a product of plaintiffs' persistence and patience, not cooperation by Ford. Accordingly, as authorized by MCR 2.313(A)(2)(c):

It is hereby ordered and adjudged that plaintiffs' Fourth Motion to Compel against Ford Motor Company and Ford Motor Company of Canada, which motion is dated May 26, 1996, and was filed on May 31, 1996, be, and the same hereby is, granted. Defendants Ford Motor Company and Ford Motor Company of Canada are to provide within 28 days hereof full and complete responses to the disputed particulars of plaintiffs' Second Request for Admissions, Fourth Set of Interrogatories, and Fifth Request for Production of Documents. If, in the judgment of this Court, appropriate responses are not provided within that time, a default will be entered against said defendants and, as to them, trial will proceed solely on the issue of damages. See MCR 2.313(B)(2)(c) and MCR 2.313(D)(1)(b). Entry of a default is the only credible response to persistent obstructionism by a litigant with Ford's economic strength. See, *Wood v DAIIE, [infra]; Thorne v Bell, [infra];* and *Frankenmuth Ins Co v ACO, Inc,* 193 Mich App 389, 396-397 [484 NW2d 718] (1992). Any lesser sanction is no penalty and will invite, not deter continued misconduct."

Ford did not fight that order. It did not appeal nor did it seek reconsideration. Instead, Ford promptly turned over 120,000 pages of documents. What plaintiffs' counsel discovered when they read those documents was disgusting; no other word would be accurate. For over two years, Ford had concealed very significant documents and information, and, worse, had blatantly lied about those documents and about the information in them; any word other than "lied" would understate what Ford did.[3] Those revelations prompted plaintiffs to ask this Court to enter a default judgment against Ford. Their counsel had run out of patience. After carefully reviewing plaintiffs' discovery requests and some of Ford's responses (hundreds of pages), studying several rounds of briefs, and listening to counsels' very helpful oral argument, this Court had to agree that an outrageous fraud has been perpetrated by Ford—a few telling examples are discussed below—and that the sanction of a default, but not a default judgment, is the appropriate response.[4]

Plaintiffs' recent briefs and their counsel's illuminating oral argument do an outstanding job of identifying the deception perpetrated by Ford. The higher courts which will be reviewing this Court's decision are invited to study those briefs and the transcript of that argument. Nothing but needless prolixity will be achieved by restating here everything said so persuasively there. Those briefs and the transcript are all part of the record. Suffice to say here, *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 207, fn 7 [476 NW2d 392] (1991), that a few examples amply demonstrate that Ford consistently concealed information legitimately requested by plaintiffs and consistently lied in its response to appropriate discovery requests. Ford does not deny the shortcomings of its discovery responses. It tries only to excuse them as unintentional or not prejudicial, and it argues strenuously that this Court lacks authority to punish, by default or otherwise, it for what it did. Obviously, the Court sees things much differently.

Early in the discovery process, back in August, 1994, plaintiffs had submitted interrogatories to Ford asking whether it had used the seats in Sarah's parents' car, a 1986 Ford Tempo, in other vehicles, as well. If it had, discovery would have to include seeking information about those other vehicle models. If the seat had been used only in Tempos, discovery could be limited to that model. Ford answered that the seats used in the Tempo "are unique to the Tempo/Topaz car lines only." That answer was not true. Plaintiffs have learned that the Tempo/Topaz seat was derived from the Escort/Lynx seat and that that seat had been used in numerous other models. Ford admits that now, but only after having been caught in a lie.

How Ford answered plaintiffs' interrogatories about seats reveals much about its handling of discovery in this case. Ford insists that it is true that "the seat track assemblies used in the Tempo are unique to the Tempo/Topaz car lines only." That may be, but the question asked of Ford was not so limited. Ford was asked whether the front "seat tracks and seat backs" installed in 1986 Tempos "were ever installed on any other Ford Motor Company vehicle." If they were, particulars were requested. Ford objected to the interrogatory as "overly-broad, vague, irrelevant, oppressive and not calculated to the discovery of admissible evidence," and then responded that "the seat track assembles used in the Tempo are unique to the Tempo/Topaz car lines only." What it did was craftily reformulate the question to ask only what it wanted to say, namely: that the seat track assemblies, not the seats themselves, were unique, thereby creating the misleading impression that the seats had not been used in any other vehicles. With that impression, plaintiffs would not expect to be told about tests and lawsuits involving the seats and other models, even though the seats were, it now turns out, the same. That was as dishonest as saying in so many words that the seats, not just the seat track assemblies, were unique to the vehicle. "It is generally recognized that 'fraud' may be consummated by suppression of facts and of the truth, as well as by open false assertions." *USF&G v Black*, 412 Mich 99, 125 [313 NW2d 77] (1981). Ford's answer was not simply a precise answer to a poor question; it was a dishonest answer, carefully crafted to mislead the reader. An impression can be so strong and so obviously what someone wanted to impart that it is a statement to that effect, in this case, a false statement.

The impact of Ford's deception was made abundantly clear by its latest discovery disclosures. Plaintiffs had asked Ford to identify and produce all tests done to establish the integrity of the seats used in 1986 Ford Tempos, as well as the same or similar seats used in other vehicles. Ford responded that it had performed 48 rear impact tests on the Tempo/Topaz seat between 1984 and 1994. The discovery disgorged in response to this Court's July order revealed that there have been hundreds of such tests performed on the same seats in numerous other models. Those tests are all highly relevant to this case and were requested by plaintiffs. By the way it responded to plaintiffs' interrogatories that the Tempo/Topaz seat was unique, Ford hid all those other tests.

Concealing those tests concealed something highly significant to this case. In those tests, the front seats routinely collapsed into the back seat on the slightest impact. Throughout this case, Ford has insisted that its seats, including those in 1986 Tempos, are designed to "yield." Ford has persistently taken great exception to any char-

acterizations of seats having "failed," "broke," or "collapsed," but the test reports just disclosed repeatedly use those very terms to describe what happened to Ford seats in collisions just like that which occurred in this case. What Ford disclosed also revealed that, years ago, it had developed, but never used, a seat capable of withstanding much greater rear-end impacts than that which injured Sarah. Until last August, Ford had disclosed none of that.

Ford also failed to disclose that it had convened a Task Force to study seat back performance, that the Task Force had had numerous tests performed on Ford seat backs and that a report was drafted, but apparently never issued. Ford attempts to justify its withholding of that information by contending that, for years, the existence of the Task Force and its work were thought to be privileged. The Task Force was finally disclosed because Ford and its counsel now conclude that the same are "probably not privileged." The claim of privilege is disingenuous. Absolutely nothing disclosed about the Task Force and its activities supports any appearance of a privilege. Furthermore, highly revealing of the claim of privilege is how Ford handled that claim. The proper response would have been to note the existence, but not disclose the particulars, of the information, and, then, decline to produce it because of a privilege. Martin, et al., *Michigan Court Rules Practice* (3d ed), Rule 2.314, p 383. The Court could then have ruled on the claim. Ford's counsel knew the right way. Ford's silence was not the assertion of a privilege, but the deliberate concealing of information known to be discoverable. The claim of a mistaken belief in a privilege is an unpersuasive rationalization.

One more example of Ford's mendacity will suffice. Another of plaintiffs' 1994 interrogatories asked Ford to identify all lawsuits against it which complained about defects in the seat backs and/or seat tracks of the 1986 Ford Tempos and other Ford vehicles utilizing the same or similar seats. At first, Ford identified only 2 such lawsuits. Later, Ford reported that there had been 48 lawsuits, but no particulars were ever disclosed. The recently-produced documents reveal that Ford has defended the Tempo/Topaz seat in 91 lawsuits. Some 19 of those lawsuits were brought on behalf of minor children who were injured due to seat failures, several of them having been back seat passengers injured just like Sarah Traxler, by a collapsing front seat. Even more startling is the revelation in the documents disclosed in response to this Court's July order that Ford has defended hundreds of lawsuits involving the same seat in other models. Nothing was disclosed about those numerous lawsuits until August, 1996. Ford's explanation for its initial inaccurate response is its supposed belief that plaintiffs were asking only about lawsuits involving 1986 Tempos, a model and

year which generated only a pair of lawsuits. That is nonsense, to
put it bluntly. Plaintiffs' interrogatory asked for all lawsuits com-
plaining about design or manufacturing defects in the front seats
"of the 1986 Ford Tempo automobile, *as well as for any other auto-
mobile employing the same or similar seat[s]"* [emphasis added].

### APPLICABLE LAW

The Court has authority to default Ford for its perverting of the
discovery process. Common sense says so. So do the Michigan
Court Rules, the case law, and the Michigan Revised Judicature
Act. According to MCR 2.313(D)(1), a trial court "may order such
sanctions as are just," including the "rendering [of] a judgment by
default," MCR 2.313(B)(2)(c), against a party which fails to answer
interrogatories. An order compelling discovery is not a prerequisite.
*LaCourse v Gupta*, 181 Mich App 293, 296 [448 NW2d 827] (1989),
*lv app den* 434 Mich 921 (1990). Since a blatantly deceptive answer
is worse than no answer—the lack of an answer is not mislead-
ing—"it would be an absurd anomaly" if the authority to punish
failing to answer interrogatories did not apply equally to giving
deliberately false answers. *Cummings v Wayne Co*, 210 Mich App
249, 251 [533 NW2d 13] (1995); and MCR 1.105. A trial judge "must
have the discretion" to treat doing something inadequately or
improperly as a failure to do it at all. Cf. *Banaszewski v Colman*,
131 Mich App 92, 95 [345 NW2d 647] (1983). In addition, the courts
have, independent of court rules, "inherent authority to sanction
misconduct." That authority "is rooted in a court's fundamental
interest in protecting its own integrity and that of the judicial pro-
cess." *Cummings v Wayne Co, supra*, at 252. See also *Bellok v
Koths*, 163 Mich App 780, 783 [415 NW2d 18] (1987), *lv app den* 430
Mich 854 (1988). Assigning to the trial courts "the front-line
responsibility for the administration of justice" requires authorizing
them to shoot back, so to speak, with the sanctions of dismissal or
default. *North v Department of Mental Health*, 427 Mich 659, 661-
662 [397 NW2d 793] (1986). The Legislature agrees. It has con-
ferred "jurisdiction and power to make any order proper to fully
effectuate the circuit court's jurisdiction and judgments." MCL
600.611; MSA 27A.611. In sum, this Court has authority to default
Ford.

Admittedly, having authority to do something does not necessa-
rily mean that it is proper in every instance to utilize that authority.
Specifically with regard to the issue at hand, the sanction of a
default "is a drastic measure and should be used with caution."
*Mink v Masters*, 204 Mich App 242, 244 [514 NW2d 235] (1994).
The court is to consider various things. Was there a "flagrant and

wanton refusal to facilitate discovery[?]," *Thorne v Bell*, 206 Mich App 625, 633 [522 NW2d 711] (1994); and *Mink v Masters, supra,* or some other "inexcusable" conduct? *Equico Lessors, Inc v Original Buscemi's, Inc*, 140 Mich App 532, 535 [364 NW2d 373] (1985). Did that conduct frustrate appropriate attempts to discover information vital to the proper development and presentation of the case, *Bellok v Koths, supra*, at 783, or did it otherwise prejudice the other party, e.g., by impairing a mediation presentation? *Barlow v Crane-Houdaille, Inc*, 191 Mich App 244, 252 [477 NW2d 133] (1991). Finally, after considering available alternatives, "[i]s the drastic sanction of default "just and proper within the context of the particular case[?]" *Houston v Southwest Detroit Hospital*, 166 Mich App 623, 629-630 [420 NW2d 835] (1987), *lv app den* 431 Mich 852 (1988); and *Bellok v Koths, supra.* The trial court need not necessarily impose lesser sanctions before ordering a dismissal or default. What the court must do is consider "whether the imposition of lesser sanctions would not better serve the interests of justice." *North v Department of Mental Health, supra*, at 662. If not, dismissing a misbehaving plaintiff's case or defaulting a misbehaving defendant is proper.

## APPLICABLE LAW APPLIED

Ford's conduct in this case satisfies all of the criteria for the drastic sanction of a default. Concealing information and lying are, there can be no dispute, inexcusable behavior. Such conduct is more than an intentional refusal to facilitate discovery, which is sufficient to warrant entry of a default. Concealing information and lying is a flagrant and wanton refusal to facilitate discovery; nothing could be more obvious. That alone probably warrants a default. Because perjury is reprehensible, engaging in it, especially, engaging in a prolonged course of it, is so offensive to the maintenance of a sound judicial process that the severest punishment may be required regardless of the perjury's effect on the case. Cf., MCR 6.508(D)(3)(b)(iii), and *People v Anderson* (Aft Rem), 446 Mich 392, 405, 406 [521 NW2d 538] (1994). Whether that is so need also not be decided in this case, however, because all of the criteria for entry of a default have been met.[6]

Ford's conduct has badly prejudiced plaintiffs and this Court. Plaintiffs' counsel has had to spend considerable effort and incur great expense acquiring from other sources information which Ford should have disclosed. More significantly, Ford's misconduct has frustrated plaintiffs in the development of information vital to a persuasive presentation of their claims. What Ford has belatedly revealed about its testing of the car seat at issue in this case, what

it appears to have learned from those tests, the availability of a safer seat, and the fact that a safer seat was never used, all go directly to what a plaintiff must prove in a case like this one and what the Supreme Court expects to be disclosed during discovery. See *Prentice v Yale Mfg Co*, 421 Mich 670, 688-689 [365 NW2d 176] (1984). It is readily apparent from Ford's recent briefs that it has a favorable "spin" on that information. To enable plaintiffs to respond, discovery needs to start anew. Plaintiffs' experts need to start all over, and a tremendous amount of follow-up inquiries must be made of Ford and its pertinent personnel. That would put off trial until next year, which would be very unfair to plaintiffs.

Ford's misconduct has also harmed this Court and the public interest. "Aside from its advantage to a party in discovering the opponent's claim, . . . [discovery] . . . has a public purpose . . . arising from reducing the time of the trial by narrowing the issues, obtaining admissions of fact, fixing the claims of the parties when the incident is fresh in their minds, and otherwise fostering accuracy and celerity of trial, and also from inducing settlements, which are made more easy when the respective claims are known." *Ewer v Dietrich*, 346 Mich 535, 542-543 [78 NW2d 97] (1956). Because of what Ford did, those benefits are unavailable, unless discovery is reopened. More significantly, Ford's misconduct "constitutes an abuse of the judicial process itself and not just a matter of inequity between the parties[.] . . . '[T]ampering with the administration of justice . . . is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.' " *Cummings v Wayne County, supra*, at 252 [quoting *Hazel-Atlas Glass Co v Hartford-Empire Co*, 322 US 238, 246; 64 S Ct 997; 88 L Ed 1250 (1944)].

No lesser sanction is sufficient. To the extent Ford's dishonesty resulted in plaintiffs' counsel having to look elsewhere for the requested information, assessing against Ford the actual costs of those searches will offset that prejudice, assuming that what amounts to just a fine is ever a sufficient response to perjury. The other prejudice to plaintiffs' case cannot be so readily rectified, however. If a default is not entered, plaintiffs must be allowed to follow-up all of the data just disclosed, e.g., fully explore the Seatback Performance Task Force and the numerous tests conducted on seats. As previously noted, that means re-starting discovery and putting off next month's trial. However, the courts of Michigan are under orders to eliminate "the injustice of delayed justice" because "[n]o greater wrong hath man judicial wrought than that of overlooking, if not encouraging delays and more delays of justice." *Hearn v Schendel*, 355 Mich 648, 653 [95 NW2d 849] (1959).

This case is already three years old, and the price of additional delay will be paid by plaintiffs, not Ford. With the passage of more time, it will be harder for plaintiffs to prove their case. Witnesses will scatter even more, and memories will become even dimmer. One of Ford's excuses for the delays in scheduling depositions was the retirement and move of many employees. That will happen more as time passes. Witnesses who remain available will remember less, and what they remember will be subject to challenge because of age. Whatever the jury is told about the delay, experience teaches that delay itself creates doubts in the minds of jurors. As a case ages, it becomes less persuasive. Since the burden of proof is on plaintiffs, they will feel the consequences of age. For that reason, even ordering Ford to pay all the costs of discovery henceforward, will not offset the prejudice to plaintiffs, but punish them, a real perversion. Ford's misconduct having impaired plaintiffs' ability to prove liability, even if reimbursed all their expenses, plaintiffs will remain significantly disadvantaged with Ford still benefitting. That is ineffectual, to say the least, in dealing with what Ford did. Furthermore, a default[ ]is very appropriate because it focuses directly on that which Ford has damaged: plaintiff's ability to prove liability.

In sum this is a case in which the drastic sanction of a default is just and proper. This is, in fact, a case in which anything less than that sanction would be improper. Numerous times, our Court of Appeals has sustained a trial court's defaulting a defendant or dismissing a plaintiff's case, which is the equivalent of a default, because of that party's wanton and flagrant violation of its discovery obligations. In *Mink v Masters, supra;* and *Chrysler Corp v Home Ins Co,* 213 Mich App 610, 612 [540 NW2d 485] (1995), the Court of Appeals affirmed defaults as a discovery sanction. Dismissals as a sanction were affirmed in *Barlow v Crane-Houdaille, Inc, supra; Welch v J Walter Thompson, USA, Inc,* 187 Mich App 49 [466 NW2d 319] (1991), *lv app den* 439 Mich 852 (1991); *LaCourse v Gupta, supra; Enci v Jackson,* 173 Mich App 30 [433 NW2d 313] (1988); *Bellok v Koths, supra;* and *Edge v Ramos,* 160 Mich App 231 [407 NW2d 625] (1987), *lv app den* 428 Mich 907 (1987). The misconduct in this case being far worse, a comparable penalty is certainly within the discretion of this Court.

Defaulting Ford does not deprive it of its right to a jury assessment of its liability. Cf., *Enci v Jackson, supra,* at 35. The right in civil cases to a trial by jury is not absolute. That right can be lost by not asking soon enough or by not timely paying the required fee. MCR 2.508(D)(1). A jury trial can also be lost by waiting too long to answer, MCR 2.603(A)(1), or by not complying with some applicable court rule or a pertinent court order. MCR 2.504(B)(1).

Finally, a litigant with a legally inadequate case is not entitled to a jury determination, but must be satisfied with a judge's ruling. MCR 2.116(I)(1). See also *Skinner v Square D Co*, 445 Mich 153, 174-175 [516 NW2d 475] (1994); and *Moll v Abbott Laboratories*, 444 Mich 1, 26-28 [506 NW2d 816] (1993). In other words, not only can the right to a trial by jury be waived by litigants, that right can be lost by inappropriate conduct during the course of a case awaiting trial. That is what has happened in this case. This Court is not taking from Ford a jury trial to which it is entitled. Ford forfeited that trial by its conduct.

One final point needs to be addressed. Ford contends, quite vigorously, that this Court is effectively estopped from now defaulting it because the Court ruled back in July that it would default Ford if it did not disclose the information which it had belatedly disclosed. This Court disagrees just as vigorously. Ford is not being defaulted because it did not obey this Court's order in July. Ford is being defaulted because the information recently disclosed reveals that, prior to that order ever being entered, Ford had engaged in a calculated campaign of concealment and deceit. This Court cannot possibly be barred from appropriately reacting to that shameful campaign because it was discovered only when this Court insisted that Ford obey the rules.

### CONCLUSION

"A primary purpose of discovery is to enhance the reliability of the fact-finding process by eliminating distortions attributable to gamesmanship." *People v Burwick*, 450 Mich 281, 298 [537 NW2d 813] (1995). Necessarily, therefore, the courts must insist that discovery be conducted in a way which "promote[s] the discovery of the true facts and circumstances of a controversy, rather than aid in their concealment." *Hallett v Michigan Consolidated Gas Co*, 298 Mich 582, 592 [299 NW2d 723] (1941); and *Ewer v Dietrich*, *supra*, at 542. Because condoning the deliberate frustration of discovery will conceal information and promote gamesmanship, such misconduct must be penalized swiftly and sternly. Justice is not served by anything less. *LaCourse v Gupta, supra*.

[Footnotes to trial court's opinion:]

[1] It is unfortunate that there are so many published cases which have dealt with obstructionism during discovery. The prevalence of it reinforces why it must be sternly punished. Otherwise, the inclination to it will not be deterred.

[2] To simplify the upcoming trial of this case, plaintiffs have agreed to dismiss the babyseat's manufacturer.

and ably explained its conclusion that Ford committed "wanton and flagrant violation of its discovery obligation." As the majority concedes, the trial court's conclusion is supported by the record. The sole remaining issue is whether the trial court abused its discretion by entering the default against Ford Motor Company. It could not be clearer from the trial court's opinion that it has *already* found that Ford's conduct was deliberate, conscious, and by careful design. The

---

[3] Courts must often form opinions as to the merits of matters before them, "often, as to the *bona fides* of the parties." *People v Houston*, 179 Mich App 753, 759-760 [446 NW2d 543] (1989), *lv app den* 434 Mich 855 (1990). "If the judge did not form judgments of the actors in those courthouse dramas called trials, he could never render decisions." *Liteky v United States*, 510 US [540, 551]; 114 S Ct 1147; 127 L Ed 2d 474 (1994).

[4] The parties were informed in October, 1996, by letter of the Court's decision. Drafting and re-drafting an opinion was going to take time. The Court wanted the parties to know its decision as soon as possible so they could meaningfully prepare for mediation, settlement negotiations, and trial. The parties' counsel were told at oral argument that they would promptly be informed of the Court's decision, but that an opinion would be delayed. The Court apologizes for how long it has taken to issue this opinion. It has been in trial consistently since mid-October.

[5] Unnecessary decisions are inappropriate because the risk of error is too great. Unnecessary decisions are often incorrect because they are made without the crucial focus provided by knowing that they will actually make a difference in a case. *Cohen v Virginia*, 6 Wheat 264, 299; 5 L Ed 257, 290 (1821), quoted in *Breckon v Franklin Fuel Co*, 383 Mich 251, 267 [174 NW2d 836] (1970); and *Alar v Mercy Memorial Hospital*, 208 Mich App 518, 532 (1995). In judging, as in many things, it is, to paraphrase Samuel Johnson, only the imminence of a hanging which can adequately concentrate the mind. Boswell, *Life of Johnson* [September 1, 1777]. A striking example of why courts should not make unnecessary decisions is *United States v Williams*, 872 F2d 773 (6th Cir, 1989). Prior to that case, dozens of published opinions had volunteered that a certain factual scenario, a scenario not involved in any of those cases, would call for a certain outcome. In *Williams*, the Sixth Circuit was actually confronted with that other scenario. When it was, the law so often previously espoused was revealed to be wrong. See *Staples v United States*, 511 US 600; 114 S Ct 1793, 1813, fn 22; 128 L Ed 2d 608 (1994).

prejudice to the plaintiffs *also* has been carefully spelled out in the trial court's opinion. Accordingly, it cannot be said that the trial court's conclusion was an abuse of discretion. MCR 2.313(B)(2). *Thorne v Bell*, 206 Mich App 625, 633; 522 NW2d 711 (1994); *Dean v Tucker*, 182 Mich App 27, 32; 451 NW2d 571 (1990); *Omlie Industries, Inc v Industro Motive Corp*, 77 Mich App 48; 257 NW2d 677 (1977).

A careful reading of the record and of the trial court's opinion reveals more than sufficient evidence to warrant its conclusion that Ford's failure to comply with discovery requests was *not* accidental or involuntary. Plaintiffs filed four motions to compel answers to interrogatories. Ford promised to respond to the motions. Ford's failure to respond adequately was not fully brought to the court's attention until July 3, 1996, with plaintiffs' *fifth* motion to compel. After review of all motions and responses, the court ordered Ford to supplement its answers and to provide responsive documents within twenty-eight days of the order (entered thirteen days after the hearing on the motion). In response to the order, Ford produced sixty-two boxes containing 120,000 pages of new documents on August 12, 1996. For the first time in two years, Ford provided information regarding historical testing documents.

Contrary to the trial court's July 16 order, Ford continued to conceal and withhold documents relating to its Seat Back Task Force and it appears that plaintiffs became aware of the existence of such task force activity through an independent investigation. In response to plaintiffs' September 30, 1996, motion for default, Ford for the first time provided some of its Seat Back Task Force documents to plaintiffs and

claimed its two-year concealment was due to an "alleged claim of privilege." In its detailed, written opinion, the trial court found that Ford does "not deny its shortcomings of its discovery responses. It tries only to excuse them as unintentional or not prejudicial, and it argues strenuously that the Court lacks authority to punish, *by default or otherwise*, it for what it did." (Emphasis added.) The opinion specified in detail various deceptions, including the failure to reveal the Seat Back Task Force study, pursuant to the court order of July, 1996, but only in response to plaintiffs' Motion for Default:

> The impact of Ford's deception was made abundantly clear by its latest discovery disclosures. Plaintiffs had asked Ford to identify and produce all tests done to establish the integrity of the seats used in 1986 Ford Tempos, as well as the same or similar seats used in other vehicles. Ford responded that it had performed 48 rear impact tests on the Tempo/Topaz seat between 1984 and 1994. The discovery disgorged in response to this Court's July order revealed that there have been hundreds of such tests performed on the same seats in numerous other models. Those tests are all highly relevant to this case and were requested by plaintiffs. By the way it responded to plaintiffs' interrogatories that the Tempo/Topaz seat was unique, Ford hid all those other tests.
>
> Concealing those tests concealed something highly significant to this case. In those tests, the front seats routinely collapsed into the back seat on the slightest impact. Throughout this case, Ford has insisted that its seats, including those in 1986 Tempos, are designed to "yield." Ford has persistently taken great exception to any characterizations of seats having "failed," "broke," or "collapsed," but the test reports just disclosed repeatedly use those very terms to describe what happened to Ford seats in collisions just like that which occurred in this case. What Ford disclosed also revealed that, years ago, it had developed, but

never used, a seat capable of withstanding much greater rear-end impacts than that which injured Sarah. Until last August, Ford has disclosed none of that.

Ford also failed to disclose that it had convened a Task Force to study seat back performance, that that Task Force had had numerous tests performed on Ford seat backs, and that a report was drafted, but apparently never issued. Ford attempts to justify its withholding of that information by contending that, for years, the existence of the Task Force and its work were thought to be privileged. The Task Force was finally disclosed because Ford and its counsel now conclude that the same are "probably not privileged." The claim of privilege is disingenuous. Absolutely nothing disclosed about the Task Force and its activities supports any appearance of a privilege. Furthermore, highly revealing of the claim of privilege is how Ford handled that claim. The proper response would have been to note the existence, but not disclose the particulars, of the information, and then decline to produce it because of a privilege. Martin, et al., *Michigan Court Rules Practice* (3d ed), Rule 2.314, p 383. The Court could then have ruled on the claim. Ford's counsel knew the right way. Ford's silence was not the assertion of a privilege, but the deliberate concealing of information known to be discoverable. The claim of a mistaken belief in a privilege is an unpersuasive rationalization.

One more example of Ford's mendacity will suffice. Another of plaintiffs' 1994 interrogatories asked Ford to identify all lawsuits against it which complained about defects in the seat backs and/or seat tracks of the 1986 Ford Tempos and other Ford vehicles utilizing the same or similar seats. At first, Ford identified only 2 such lawsuits. Later Ford reported that there had been 48 lawsuits, but no particulars were ever disclosed. The recently-produced documents reveal that Ford has defended the Tempo/Topaz seat in 91 lawsuits. Some 19 of those lawsuits were brought on behalf of minor children who were injured due to seat failures, several of them having been back seat passengers injured just like Sarah Traxler, by a collapsing front seat. Even more startling is the revelation in the documents disclosed in response to this Court's July order that Ford has

defended hundreds of lawsuits involving the same seat in
other models. Nothing was disclosed about those numerous
lawsuits until August, 1996. Ford's explanation for its initial
inaccurate response is its supposed belief that plaintiffs
were asking only about lawsuits involving 1986 Tempos, a
model and year which generated only a pair of lawsuits.
That is nonsense, to put it bluntly. Plaintiffs' interrogatory
asked for all lawsuits complaining about design or manufac-
turing defects in the front seats "of the 1986 Ford Tempo
automobile, *as well as for any other automobile employing
the same or similar seat[s]*" [emphasis in original].

The majority opinion accepts Ford's arguments that
it is "entitled" to an evidentiary hearing to demon-
strate that Ford's actions were accidental or involun-
tary and that plaintiffs were not prejudiced by Ford's
mistakes. I respectfully disagree because the trial
court already found and supported its findings that
(1) Ford never requested an evidentiary hearing, (2)
Ford's activity in this lawsuit was clearly deliberate
and intentional, and (3) prejudice to plaintiffs was
clearly established.

Ford never filed a motion for an evidentiary hear-
ing. The only mention by Ford of an evidentiary hear-
ing was during oral argument on plaintiffs' motion for
default, when defense counsel expressed a willing-
ness to participate in an evidentiary hearing *if needed*
and left the decision to the trial court.[2] Issues raised
the first time on appeal are not subject to appellate

---

[2] As plaintiffs note in their brief on appeal, defense counsel made two
passing references to an evidentiary hearing during oral argument of
plaintiffs' Motion for Default Judgment, but left the decision to the trial
court:

> *Defense Counsel: If the Court wanted more examples of that,*
> Ford would be happy to provide an evidentiary hearing and have
> the people from Ford's discovery group or anyone else the Court
> wished to inquire [sic] list additional items.

review. *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994).

But most important, the reasons for the remand, as argued by Ford and articulated by the majority, have already been carefully and thoroughly dispelled by the trial court. The trial court specifically found that Ford's actions were "more than an intentional refusal to facilitate discovery," that there was a "flagrant and wanton refusal to facilitate discovery." The trial court made clear its finding that Ford "engaged in a calculated campaign of concealment and deceit," that Ford "consistently" and "blatantly lied" and that Ford repeatedly "perverted" the discovery process with "dishonest answers[s], carefully crafted to mislead the reader." The trial court also thoroughly documented the many needless motions, follow-up inquiries and clarifications demanded of plaintiffs, and specifically found that Ford's actions unnecessarily complicated and delayed for years the trial in this case:

> Ford's conduct has badly prejudiced plaintiffs and this Court. Plaintiffs' counsel has had to spend considerable effort and incur great expense acquiring from other sources information which Ford should have disclosed. More significantly, Ford's misconduct has frustrated plaintiffs in the development of information vital to a persuasive presentation of their claims. What Ford has belatedly revealed about its testing of the car seat at issue in this case, what it appears to have learned from those tests, the availability of a safer seat, and the fact that a safer seat was never used, all go directly to what a plaintiff must prove in a case like

---

*Defense Counsel: [i]f the Court feels it needs more information,* your Honor, can we respectfully request the right to have an evidentiary hearing on two issues . . . .

I believe it is apparent that Ford expressly left the decision to hold an evidentiary hearing to the trial court.

this one and what the Supreme Court expects to be disclosed during discovery. See *Prentice v Yale Mfg Co*, 421 Mich 670, 688-689 [365 NW2d 176] (1984). It is readily apparent from Ford's recent briefs that it has a favorable "spin" on that information. To enable plaintiffs to respond, discovery needs to start anew. Plaintiffs' experts need to start all over, and a tremendous amount of follow-up inquiries must be made of Ford and its pertinent personnel. That would put off trial until next year, which would be very unfair to plaintiffs.

\*     \*     \*

This case is already three years old, and the price of additional delay will be paid by plaintiffs, not Ford. With the passage of more time, it will be harder for plaintiffs to prove their case. Witnesses will scatter even more, and memories will become even dimmer. One of Ford's excuses for the delays in scheduling depositions was the retirement and move of many employees. That will happen more as time passes. Witnesses who remain available will remember less, and what they remember will be subject to challenge because of age. Whatever the jury is told about the delay, experience teaches that delay itself creates doubts in the minds of jurors. As a case ages, it becomes less persuasive. Since the burden of proof is on plaintiffs, they will feel the consequences of age. For that reason, even ordering Ford to pay all the costs of discovery henceforward, will not offset the prejudice to plaintiffs, but punish them, a real perversion. Ford's misconduct having impaired plaintiffs' ability to prove liability, even if reimbursed all their expenses, plaintiffs will remain significantly disadvantaged with Ford still benefitting. That is ineffectual, to say the least, in dealing with what Ford did. Furthermore, a default[ ]is very appropriate because it focuses directly on that which Ford has damaged: plaintiff's [sic] ability to prove liability.

As the majority agrees, the trial court's findings and conclusions are supported by the record. Because of Ford's egregious and intentional conduct, because plaintiffs have been severely harmed by the prolonged

and needless delay and concealment that will necessitate beginning discovery all over again, and because Ford has been provided *years* of due process in this matter, I would affirm.